**Consuelo TORRES,**

v.

**Jo Anne B. BARNHART[1], Commissioner of the Social Security Administration.**

**No. CIV.A.2001–11578–RBC.**

United States District Court,
D. Massachusetts.

March 13, 2003.

---

1. Larry B. Massinari, the original defendant in this action, was sued in his official capacity as the Acting Commissioner of the Social Security Administration only. (See Complaint # 1 ¶ 3) On November 9, 2001, Mr. Massinari was succeeded by Jo Anne B. Barnhart as the Commissioner. Thus, pursuant to Fed. R.Civ.P. 25(d)(1), Ms. Barnhart has automatically become the defendant in this case. See Fed.R.Civ.P. 25(d)(1) ("When a public officer

Stephen L. Raymond, Haverhill, MA, for Consuelo Torres, Plaintiff.

Rayford A. Farquhar, United States Attorney's Office, Boston, MA, for Jo Anne Barnhart, Defendant.

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (# 12) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (# 17)**

COLLINGS, United States Magistrate Judge.

### I. Introduction

On September 13, 2001, plaintiff Consuelo Torres (hereinafter "Torres") filed her

is a party to an action in his official capacity and during its pendency … ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party."); see also 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of the defendant Commissioner of Social Security, Jo Anne B. Barnhart's (hereinafter "the Commissioner"), decision denying her benefits. Proof of service upon the defendant was not filed with the Court until January of 2002. Following an extension of time, the Commissioner answered the complaint on March 8, 2002. Three days later, with the parties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

On May 10, 2002, Torres submitted a motion for judgment on the pleadings together with a memorandum in support. Approximately two months later on July 11, 2002, the defendant countered with a motion for an order affirming the decision of the Commissioner along with a memorandum of law. With the issues thus joined, the parties' motions stand ready for resolution.

## II. The Administrative Background

On April 23, 1996, Torres filed applications for disability insurance benefits and supplemental security income payments with the Social Security Administration based upon a disability onset date of July 1, 1995. (TR at 77–80, 81–83 [2]) The plaintiff's applications were denied upon both initial review and reconsideration. (TR at 58, 59–62, 63–66) Dissatisfied with the agency's decision, Torres filed a request for a hearing by an administrative law judge (hereinafter "ALJ"). (TR at 67)

The plaintiff's administrative hearing was first scheduled for March 4, 1998, but she did not appear. (TR at 21, 36–37, 72) When Torres thereafter proffered a good reason explaining her failure to attend, the hearing was reset and held on October 30, 1998. (TR at 21, 39–55, 112) In short order on November 11, 1998, the ALJ issued an unfavorable decision finding that the plaintiff did "not have a medically documented impairment or combination of impairments which has had more than a slight affect (sic) on her ability to work for any continuous 12 month period since her alleged disability onset date." (TR at 21–22) In other words the ALJ determined that Torres was not disabled within the meaning of the Social Security Act. (TR at 22)

The plaintiff exercised her right to appeal on December 10, 1998, when she requested that the Appeals Council review the ALJ's decision. (TR at 17) While her appeal was pending, Torres submitted additional medical evidence in support of her claims. (TR at 215–274) On July 18, 2001, the Appeals Council denied the plaintiff's request for review, thus effectively rendering the ALJ's decision the final decision of the Commissioner which is subject to judicial review. (TR at 4–5)

## III. The Evidence

At the administrative hearing, Torres testified that she was born on February 3, 1938. (TR at 45, 77, 81) She is a high school graduate who completed three and one half years at Brooklyn College. (TR at 46, 88) Torres worked for about twenty years as a "school para-professional", i.e., as an educational associate, a substitute teacher and a senior tutor of English and bilingual reading, math and science. (TR at 50, 88) When the bilingual program was abolished, the plaintiff worked as a food inspector for about a year in 1994/1995. (TR at 50, 88) Thereafter Torres collected unemployment and welfare.[3] It is undis-

---

**2.** The designation "TR_" refers to the pertinent pages of the certified administrative record of proceedings filed with the defendant's answer to the complaint.

**3.** From February through March, 1997, the

puted that the plaintiff met the special earnings required for insured status under the Social Security Act through the date that the ALJ issued his decision, November 11, 1998. (Memorandum of Law # 13 at 2; Defendant's Memorandum # 18 at 3)

With regard to her asserted medical problems, Torres testified that she had hypertension and an enlarged heart, a limp and pain in her muscles. (TR at 46) The plaintiff also stated that she was taking medication for depression and anxiety. (TR at 47) She complained that when she sat for too long, her hands and feet became numb. (TR at 48) Torres stated that she could lift about ten pounds, but not for too long. (TR at 48)

Torres testified that on a typical day she bathes and dresses herself, does light household chores, shops and prepares her own meals. (TR at 49)

The plaintiff's medical records dated April 12, 1996 reflect that she was examined at HS Systems, Inc., a health evaluation service, at the request of the human resources administration of the City of New York. (TR at 117–118) Torres was found to have elevated blood pressure, an abnormal EKG and an abnormal CBC and so was directed to seek further evaluation and/or follow-up immediately. (TR at 117)

On May 14, 1996, Dr. E.B. Balinberg performed a physical examination of the plaintiff. Her complaints were noted to be:

> In the Disability Report: Elevated blood pressure. Abnormal ECG. Abnormal CBC. Shortness of breath. Headaches. On 3B: "Swollen knees. Inflamation of the right arm. Numbness when lay to sleep on the left side on my chest. Trouble breathing and tiredness."

TR at 122.

Upon a thorough physical examination of Torres, Dr. Balinberg's significant findings were that her blood pressure was 130/80 sitting and 140/80 standing, and that she had moderate irregular arteries in the interiors of her eyes. (TR at 122) The plaintiff "complain[ed] of pain on deep palpation along the descending colon." (TR at 123) While Torres had a normal range of motion in her left knee, the flexion in her right knee was "limited by pain at 100 degree." (TR at 123) There was a normal range of motion in both hips notwithstanding her complaints of pain on the right side. (TR at 123)

Dr. Balinberg's diagnosis was "[h]istory of hypertension—possible Stage I and [a]rthritis—possibly osteoarthritis." (TR at 124) With respect to functional capacity to do work-related activities, the doctor wrote:

> I highly suggest evaluation by a psychiatrist for generalized anxiety disorder, possibly also panic attack and adjustment disorder. If approved, please see the opinion of the psychiatrist about her ability to function in a work setting. Based on physical findings mentioned above, I estimated that she has some restriction in her capacity to perform heavy isometric activities like to lift, to carry, to push and to pull heavy loads, some restriction in her capacity to stand up long periods of time, to run, to walk long distances.

TR at 124.

On June 25, 1996, a medical consultant whose signature is illegible completed an SSA Residual Physical Functional Capaci-

---

plaintiff was required to participate in a workfare program in connection with her re-

ceipt of welfare benefits. (TR at 42–44, 171)

ty form with respect to Torres wherein that consultant concluded that no exertional limitations had been established, no postural limitations had been established, no manipulative limitations had been established, no visual limitations had been established, no communicative limitations had been established and no environmental limitations had been established. (TR at 102–109)

The next medical record is dated April 5, 1997 from the Brookdale University Hospital and Medical Center (hereinafter "Brookdale") where the plaintiff arrived at the emergency room complaining of heart palpitations, dizziness and that she had "passed out." (TR at 210, 212) Torres' blood pressure was measured at 170/105, but it was noted that she had not been taking her anti-hypertensive medication for the past week. (TR at 121) With her examination in all other respects being within normal limits, the plaintiff was diagnosed with uncontrolled hypertension and discharged in stable condition. (TR at 212–213)

The following month on May 28, 1997, Torres returned to Brookdale, on this occasion complaining of shortness of breath and coughing as well as pain in the back and knees and weakness. (TR at 206) The nursing assessment revealed that the plaintiff was conscious and oriented, her lungs were clear and she had no wheezing or rale at that time. (TR at 206) The record reflects that "two weeks ago had same complaints and told it was viral." (TR at 209) Torres complained about stress at work and at home and asked to see a social worker. (TR at 209) She was ultimately diagnosed with a viral syndrome and was released in stable condition with the admonition to drink plenty of fluids and get bed rest. (TR at 208)

Torres next was seen at the Catholic Medical Center of Brooklyn & Queens (hereinafter "Catholic") on September 8, 1997, where she requested treatment for her hypertension. (TR at 147) She related that she stopped taking her anti-hypertensive medicine due to its side effects. (TR at 147) The plaintiff also stated that she cried "a lot." (TR at 148) An EKG taken at that time was determined to be abnormal. (TR at 265) The attending physician concluded that Torres' hypertension was under "fair control" and that she suffered from depression and dyspepsia. (TR at 151) A new anti-hypertensive medication was prescribed. (TR at 148)

Four days later on September 12, 1997, Torres returned to Catholic to follow-up on the hypertension and depression diagnosis. (TR at 153) At that time Zoloft was prescribed for the depression, and a low salt diet for the hypertension. (TR at 154)

On October 30, 1997, Torres tripped and fell and then presented at Brookdale with shoulder pain. (TR at 131–132) The plaintiff was found to have dislocated her left shoulder. (TR at 134) Her shoulder was put in a sling and she was prescribed Tylenol for pain. (TR at 137)

In another follow-up visit to Catholic on January 9, 1998, Torres had an x-ray taken of her shoulder which she had previously dislocated. (TR at 168) The x-ray was negative, but physical therapy was recommended. (TR at 157–168)

The plaintiff was again seen at Catholic on March 4, 1998, this time complaining that she was reluctant to take trains or leave her house because she felt panicked in crowded situations. (TR at 239–240) It is noted in the record that Torres had run out of Zoloft the prior week. (TR at 239) The plaintiff was again diagnosed with depression and anxiety, her prescriptions were refilled and further testing was indicated to rule out fibromyalgia. (TR at 239) Catholic's records reflect that Torres

broke scheduled psychiatric appointments on March 7th and March 21st of 1998. (TR at 258)

On March 31, 1998, Torres was seen at Brookdale because she had fallen and was in pain with ecchymosis of the right eyebrow. (TR at 190) She was examined and then discharged to home. (TR at 192)

The next day, April 1, 1998, the plaintiff went to Catholic for an orbital contusion and left shoulder dysfunction from the fall. (TR at 242) An infraorbital abrasion and periorbital hematoma were seen upon examination. (TR at 241) At a follow-up visit on April 8, 1998, her injuries were well healed. (TR at 243)

The Catholic records show that Torres failed to keep three more scheduled psychiatric appointments in April, May and June of 1998. (TR at 245)

The plaintiff was evaluated by Harvey Nightingale, Ph.D., a clinical psychologist, on April 28, 1998, for purposes of her social security claim. (TR at 170) The plaintiff was described as:

> well groomed and neatly and appropriately dressed...Ms. Torres was cooperative with the interview, expressed herself and communicated well, and comprehended the interviewers' (sic) questions. She is well oriented, her sensorium is clear, her thinking is relevant and coherent, and there are no signs of thought disorder. Ms. Torres is a pleasant, charming, and gracious woman who carries herself well.

TR at 170.

Following the interview, Dr. Nightingale proffered the diagnostic impression of "depression and anxiety attacks, dysthymic disorder and panic disorder without agoraphobia." (TR at 171) He concluded that Torres' "mental and emotional condition has deteriorated over the last few years, and she no longer possesses her original stamina and fortitude. Her capacity to sustain regular employment is therefore limited at the present time." (TR at 172)

On May 2, 1998, the plaintiff was seen by Dr. Henri Hall, a psychiatry attending at Catholic. (TR at 249) Torres complained of feeling despondent, having crying spells, insomnia, low energy and anhedonia. (TR at 249) Her psychomotor activity was found to be retarded and her affect depressed. (TR at 249) Dr. Hall diagnosed the plaintiff with major depression, prescribed Serzone, and recommended that she return in one month. (TR at 249)

On June 18, 1998, Dr. Nightingale completed a Mental Residual Functional Capacity Assessment form. (TR at 174–176) Based upon his evaluation of Torres, Dr. Nightingale noted that her ability to complete a normal workweek without interruptions from psychologically based symptoms was markedly limited; her ability to maintain attention and concentration for extended periods and her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance were moderately limited; and her ability to carry out detailed instructions, her ability to respond appropriately to changes in the work setting, her ability to travel to unfamiliar places or use public transportation and her ability to set realistic goals or make plans independently were mildly limited. (TR at 174–176) With respect to the other thirteen mental activities assessed, there was found to be no evidence of limitation. (TR at 174–176)

On October 27, 1998, Torres was again seen at Catholic, this time with complaints of muscle pain in her upper extremities and fatigue. (TR at 252) Decreased abduction in her upper extremities was observed upon examination. (TR at 252) It is noted in the record that Torres had not been seen in the clinic for four months and

had only been given two months worth of medication at her last visit. (TR at 252)

The plaintiff was seen by Dr. Hall on October 31, 1998 for depression and low energy. (TR at 255) Her medications, Ambien and Paxil, were refilled and she was reminded that she must take them regularly. (TR at 255)

At a follow-up visit to Catholic on November 17, 1998, the plaintiff advised that the Ambien helped her to sleep and that the nausea it caused was relieved by eating. (TR at 256) The attending doctor found Torres' hypertension to be under fair control and she was advised to return in four weeks. (TR at 256)[4]

### IV. The Standard Of Review

Title 42 U.S.C. § 405(g) provides, in relevant part:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...

The Court's role in reviewing a decision of the Commissioner under this statute is circumscribed:

We must uphold a denial of social security disability benefits unless "the Secretary has committed a legal or factual error in evaluating a particular claim." *Sullivan v. Hudson,* 490 U.S. 877, 885, 109 S.Ct. 2248, 2254, 104 L.Ed.2d 941 (1989). The Secretary's findings of fact are conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

*Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d 15, 16 (1 Cir., 1996); *see also Reyes Robles v. Finch,* 409 F.2d 84, 86 (1 Cir., 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation.")

The Supreme Court has defined "substantial evidence" to mean " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) *quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Ortiz v. Secretary of Health & Human Services,* 955 F.2d 765, 769 (1 Cir., 1991). It has been explained that:

In reviewing the record for substantial evidence, we are to keep in mind that "issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary." The Secretary may (and, under his regulations, must) take medical evidence. But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for him, not for the doctors or for the courts. We must uphold the Secretary's findings in this case if a reasonable mind, reviewing the record as a whole,

---

**4.** The records post-dating the plaintiff's administrative hearing were submitted to, and considered by, the Appeals Council in rendering its decision. (TR at 4)

could accept it as adequate to support his conclusion.

*Lizotte v. Secretary of Health and Human Services,* 654 F.2d 127, 128 (1 Cir., 1981) *quoting Rodriguez v. Secretary of Health and Human Services,* 647 F.2d 218, 222 (1 Cir.1981); *Geoffroy v. Secretary of Health and Human Services,* 663 F.2d 315, 319 (1 Cir., 1981) ("In any event, whatever label the parties or the court ascribe to the procedure used to review the Secretary's decision, statute and long established case law make clear that the court's function is a narrow one limited to determining whether there is substantial evidence to support the Secretary's findings and whether the decision conformed to statutory requirements." (citations omitted)).

■ In other words, if supported by substantial evidence, the Commissioner's decision must be upheld even if the evidence could also arguably admit to a different interpretation and result. Lastly,

Even in the presence of substantial evidence, however, the Court may review conclusions of law, *Slessinger v. Sec'y of Health & Human Servs.,* 835 F.2d 937, 939 (1st Cir.1987) (per curiam) (*citing Thompson v. Harris,* 504 F.Supp. 653, 654 [D.Mass., 1980] ), and invalidate findings of fact that are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (per curiam).

*Musto v. Halter,* 135 F.Supp.2d 220, 225 (D.Mass., 2001).

### V. Discussion

■ It is perhaps best to begin with an overview of the legal framework. The burden is on the plaintiff to prove that she is under a disability in order to establish her right to disability insurance benefits. *Bowen v. Yuckert,* 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). As defined in the Social Security Act, disability means the

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Title 42 U.S.C. §§ 416(I)(1) and 423(d)(1)(A).

The relevant statute further provides that:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Title 42 U.S.C. § 423(d)(2).

■ Thus as the statute makes plain, a mental or physical impairment alone is not enough. To be entitled to benefits, a claimant also must be unable to engage in substantial gainful work as a result of that impairment. *See, e.g., McDonald v. Secretary of Health and Human Services,* 795 F.2d 1118, 1119–20 (1 Cir., 1986); *Goodermote v. Secretary of Health and Human Services,* 690 F.2d 5, 6 (1 Cir., 1982) ("Thus, 'disability' under this statute has a 'medical' part, concerning the nature and

severity of a claimant's impairment, and a 'vocational' part, concerning the availability of suitable work."); *Thomas v. Secretary of Health and Human Services*, 659 F.2d 8, 9 (1 Cir., 1981).

In reaching his decision, the ALJ in the instant case undertook the five step evaluation process established by SSA regulations. See 20 C.F.R. § 404.1520; *Mills v. Apfel*, 244 F.3d 1, 2 (1 Cir., 2001), cert. denied, 534 U.S. 1085, 122 S.Ct. 822, 151 L.Ed.2d 704 (2002); *Goodermote*, 690 F.2d at 6–7. The applicable regulation provides as follows:

§ *404.1520 Evaluation of disability in general.*

*(a) Steps in evaluating disability.*

We consider all evidence in your case record when we make a determination or decision whether you are disabled. When you file a claim for a period of disability and/or disability insurance benefits or for child's benefits based on disability, we use the following evaluation process. If you are doing substantial gainful activity, we will determine that you are not disabled. If you are not doing substantial gainful activity, we will first consider the effect of your physical or mental impairment; if you have more than one impairment, we will also consider the combined effect of your impairments. Your impairment(s) must be severe and meet the duration requirement before we can find you to be disabled. We follow a set order to determine whether you are disabled. We review any current work activity, the severity of your impairment(s), your residual functional capacity, your past work, and your age, education, and work experience. If we can find that you are disabled or not disabled at any point in the review, we do not review your claim further. Once you have been found entitled to disability benefits, we follow a somewhat different order of evaluation to determine whether your entitlement continues, as explained in § 404.1594(f).

*(b) If you are working.*

If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.

*(c) You must have a severe impairment.*

If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

*(d) When your impairment(s) meets or equals a listed impairment in Appendix 1.*

If you have an impairment(s) which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.

*(e) Your impairment(s) must prevent you from doing past relevant work.*

If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

*(f) Your impairment(s) must prevent you from doing any other work.*

(1) If you cannot do any work you have done in the past because you have a severe impairment(s), we will consider your residual functional capacity and your age, education, and past work experience to see if you can do other work. If you cannot, we will find you disabled.

(2) If you have only a marginal education, and long work experience (i.e., 35 years or more) where you only did arduous unskilled physical labor, and you can no longer do this kind of work, we use a different rule (see § 404.1562).

20 C.F.R. § 404.1520.

The ALJ stopped at the second step of the analysis, concluding that "the claimant does not have an impairment or combination of impairments which more than slightly limits her ability to perform basic work-related activities; therefore, she does not have a 'severe' impairment." (TR at 27)

In reaching this conclusion, the ALJ engaged in a thorough review of the evidence. At the outset, he acknowledged the plaintiff's history of hypertension while simultaneously noting that her blood pressure had never been documented as being elevated before April of 1996 even though her disability onset date is alleged to be July of 1995. (TR at 23) In addition it was observed that later instances when Torres' blood pressure was found to be high coincided with times when the plaintiff had failed to take her medication for a periods of days or weeks. (TR at 23) The ALJ also considered that "it is not documented that this condition, which generally is asymptomatic in nature, is accompanied by evidence of definite end organ damage involving the heart, eyes, kidneys, central nervous system or large arterial vessels." (TR at 23) In sum, the ALJ determined that Torres' hypertension was controllable with medication and "not accompanied by manifestations of cardiopulmonary disease." (TR at 23)

With respect to the plaintiff's complaints regarding knee pain, the ALJ accepted that in May of 1996 Torres had presented to Dr. Balinberg with knee pain that limited the flexion of the knee to a degree, but "extension of the knee was within normal limits, and no signs of effusion, crepitus, inflammation, synovitis, warmth, or deformity of either knee was appreciated by Dr. Balinberg at that time." (TR at 24) It was noted that apart from a passing reference to knee pain in a May 1997 medical record, there is no documentation of the plaintiff ever complaining to medical providers about pain in her knee or of such medical providers diagnosing her with knee abnormalities. (TR at 24) Combined with the lack of any x-ray evidence indicating any joint or bone irregularities, the ALJ concluded that "there is no medical basis for finding that she suffers from a functionally limiting knee pathology or pain." (TR at 24)

Turning to Torres' complaints about shoulder pain, the ALJ recognized that on October 30, 1997, the plaintiff had fallen and dislocated her shoulder. (TR at 24) When x-rays were taken the following day post-reduction, there was no fracture or dislocation and Torres' shoulder was put in a sling. (TR at 24) The only other reference to the shoulder in the medical documents was the plaintiff's reported loss of motion in her shoulder at a clinic visit in January, 1998. (TR at 24) Based upon this evidence, the ALJ determined that Torres had failed to prove that she had endured shoulder pain for 12 continuous months. (TR at 24)

Torres' challenge to the ALJ's decision is targeted solely on her alleged mental impairment. Given these circumstances, the ALJ's decision vis-a-vis the plaintiff's mental status shall be quoted at length:

In the instant case, it is recognized that the claimant, who reportedly received 6 months of outpatient psychotherapy in 1994 after losing her job, has complained of anxiety and depression at various times since May 1996, when a consultative examiner suggested that she might have a generalized anxiety disorder. However, clinic records fail to document complaints of depression prior to September 1997, when she reported being depressed by the depressing stories she heard at her workfare job, and it is noted that no complaints of anxiety or depression were indicated during her clinic visits in October 1997 and December 1997, that she reported feeling better on Zoloft, an anti-depressant medication, during her January 8, 1998 clinic visit, and that no complaints of anxiety or depression were noted during her last documented clinic visits in March 1998...It is further noted that when seen by Dr. Nightingale for a psychological evaluation at the behest of her representative in April 1998, she presented as a well groomed and neatly and appropriately dressed individual who was cooperative, communicated well, demonstrated clear thinking, and carried herself well. Although the doctor went on to offer diagnoses of a dysthymic disorder and a panic disorder without agoraphobia, no abnormalities of behavior, affect, thought, memory, orientation, or contact with reality, were appreciated by the doctor, or are otherwise demonstrated in the record. Likewise, no examiner, including Dr. Nightingale, had noted any restrictions in her activities of daily living, her social functioning, or her concentration, persistence or pace due to anxiety, depression, or any other symptom. In fact, there is nothing in Dr. Nightingale's report which supports his diagnoses, or functional limitations he subsequently reported in June 1998, other than her subjective complaints...In view of this, and the fact that Dr. Nightingale only saw the claimant once and is not a treating source, no weight need be afforded his totally unsubstantiated and uncorroborated conclusions concerning her mental functioning, and I am instead persuaded to find that she does not suffer from medically documented manifestations of anxiety and depression which, with continued compliance with treatment, more than minimally affect her ability to meet the basic mental demands of work.

Of course, it is recognized that an individual's symptoms can play a significant role in determining whether or not an individual is "disabled"...In the instant case, it is initially noted that although the claimant has alleged disability to work since July 1, 1995, she was not under the care of any clinic, physician, or mental health professional or otherwise being treated for any symptom or medical condition at that time. In fact, although she was seen for a welfare medical evaluation in April 1996 and for a consultative examination at the request of the State agency in May 1996, the record is devoid of evidence from a treating source or any other examiner prior to April 1997, nearly two years *after* her alleged disability onset date. It is further noted that she has received only conservative treatment on a somewhat sporadic and irregular basis since April 1997, that many of her clinic visits were for routine follow-up and prescription renewals for hypertension, that there is no evidence documenting that medications, when taken as prescribed, have not been effective in controlling her hypertension and her subjective complaints of anxiety and depression, that no treating source has declared her to

be disabled or has reported any limitations in her functioning, and that her activities of daily living clearly are not consistent with an individual who is markedly restricted as she currently alleges. In regard to the latter, when she completed a disability questionnaire in April 1995, she reported that she cooked two times a day, that she shopped two times a week, that she washed dishes and cleaned the floor and bathroom every day, that she laundered her own clothes, that she went to church every Sunday, that she visited church parishioners who were homebound by sickness, and that she used public transportation...Although she has subsequently alleged difficulties with these activities, this is not independently corroborated by any examiner, including D. Nightingale, or by any other individual. In view of these factors, it is concluded that

the claimant's complaints of disabling pain, shortness of breath, anxiety, and depression, in addition to being unsupported by objective medical evidence, also are inconsistent with the weight of the nonmedical evidence and are not, therefore, entirely credible.

TR at 25–26.

■ Torres raises two specific issues in seeking a reversal and remand of the ALJ's decision. First she claims that the ALJ applied the incorrect severity standard in finding her impairment to be not severe at step two. The defendant admits that the ALJ cited to 20 C.F.R. §§ 404.1545(c)[5] and 416.945(c)[6] rather than the appropriate 20 C.F.R. §§ 404.1520a(c) (reproduced, infra) and 416.920a(c)[7], but asserts that the mistake does not constitute reversible error.

5. This regulation provides:
   404.1545 Your residual functional capacity.
   *    *    *    *    *    *
   (c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

6. This regulation provides:
   416.945 Your residual functional capacity.
   *    *    *    *    *    *
   (c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions,

and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

7. This regulation, which for all intents and purposes is identical to 20 C.F.R. § 404.1520a, provides:
   416.920a Evaluation of mental impairments.
   *    *    *    *    *    *
   (c) Rating the degree of functional limitation.
   (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.
   (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with

Title 20, C.F.R. § 404.1520a(c) provides the framework within which the ALJ should have determined whether Torres had a "severe" mental impairment. It provides:

*404.1520a Evaluation of mental impairments.*

\*　　\*　　\*　　\*　　\*　　\*

*(c) Rating the degree of functional limitation.*

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.
(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.
(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Torres argues that since the standard to be applied at step two is a liberal, de minimus one, it was reversible error to employ the more stringent test. In support of her contention, Torres cites the case of *McDonald v. Secretary of Health and Human Services,* 795 F.2d 1118 (1 Cir., 1986) in which the First Circuit held that:

A finding of "non-severe" is only to be made where "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered..." The impairment must be such that a finding of non-disability would necessarily result even if the vocational factors were considered.

*McDonald,* 795 F.2d at 1124–5.

Notwithstanding his citation to the incorrect regulations, it is abundantly plain from the ALJ's decision that his determination that Torres' impairments were not severe falls squarely under the McDonald guidance. He considered all the evidence and made all the necessary findings which are included within 20 C.F.R. § 404.1520a(c) even though he did not cite that section. For example, § 404.1520a(c)(1) requires that the ALJ "...consider all available clinical signs and laboratory findings, the effects of [her] symptoms, and how [her] functioning [might] be affected by factors, including, but not limited to, chronic mental disorders, structured settings, medication and other treatment." After reviewing Torres' medical history, the ALJ specifically found "that she does not suffer from medically documented manifestations of anxiety and depression which, with continued compliance with treatment, more than minimally

affect her ability to meet the basic mental demands of work." (TR at 25)

Similarly, § 404.1520a(c)(2) mandates that the ALJ must ... "rate the degree of [her] functional impairment based on the extent to which [her] impairment(s) interferes with [her] ability to function independently, appropriately, effectively, and on a sustained basis." In this regard the ALJ noted that Torres' records reflect that Dr. Nightingale, the clinical psychologist chosen by her attorney, described her "as a well groomed and neatly and appropriately dressed individual who was cooperative, communicated well, demonstrated clear thinking, and carried herself well." (TR at 25) Further, neither Dr. Nightingale nor any other practitioner found any "abnormalities of behavior, affect, thought, memory, orientation, or contact with reality." (TR at 25) The ALJ also observed that "no treating source has declared her to be disabled or has reported any limitations in her functioning and that her activities of daily living clearly are not consistent with an individual who is markedly restricted as she currently alleges." (TR at 26)

Continuing, § 404.1520a(c)(3) delineates the "four broad functional areas in which [the ALJ] will rate the degree of [her] functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." With respect to these considerations, in addition to those portions of his decision to which reference has already been made, the ALJ determined that "no examiner...has noted any restrictions in her activities of daily living, her social functioning, or her concentration, persistence or pace due to anxiety, depression, or any other symptom." (TR at 25) Moreover, the ALJ related that by her own report the plaintiff "cooked two times a day, that she shopped two times a week, that she washed dishes and cleaned

the floor and bathroom every day, that she laundered her own clothes, that she went to church every Sunday, that she visited church parishioners who were homebound by sickness, and that she used public transportation." (TR at 26 [8])

Lastly, § 404.1520a(4) required that the ALJ "rate the degree of limitation in the first three functional areas...[on a] five-point scale: None, mild, moderate, marked, and extreme." As just noted, the ALJ stated that the medical records reflected that no examiner had indicated that the plaintiff had any limitations in these functional areas. (TR at 25)

With respect to the last functional area, i.e., episodes of decompensation, the regulation states that the ALJ was to apply a "four-point scale: None, one or two, three, four or more." The ALJ made no findings on episodes of decompensation because no evidence was offered that there had been any such episodes, and, consequently, the ALJ made no rating on this functional area.

The clear implication of the ALJ's decision is that the plaintiff's conditions can be controlled if she complies with her medication regime. Moreover, he correctly observed that "no treating source has declared her to be disabled or has reported any limitations to her functioning." In short, based on the facts as found, Torres' impairments were not severe within the meaning of step two.

■ The plaintiff's second contention is that the ALJ's determination that her mental impairment was not severe is not supported by substantial evidence. This argument is unavailing. Despite the plaintiff's apparent argument to the contrary, just because Torres suffers from depression and anxiety simply does not mean, a fortiori, that she has "any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." As detailed above, the ALJ clearly and carefully considered the evidence, both testimony and medical records, proffered by the plaintiff. He was well within the bounds of his role as trier of fact both in refusing fully to accept Torres' credibility regarding her alleged restrictions (*Burgos Lopez v. Secretary of Health and Human Services,* 747 F.2d 37, 40 (1 Cir.1984); *Torres v. Secretary of Health and Human Services,* 668 F.2d 67, 68 (1 Cir., 1981); *Lizotte v. Secretary of Health and Human Services,* 654 F.2d 127, 130 (1 Cir., 1981)) and in determining based on all the relevant factors and evidence that the plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision is amply supported by the record.

### IV. Conclusion And Order

For the reasons stated it is ORDERED that the Plaintiff's Motion For Judgment On The Pleadings (# 12) be, and the same hereby is, DENIED. It is FURTHER ORDERED that Defendant's Motion For Order Affirming The Decision Of The Commissioner (# 17) be, and the same hereby is, ALLOWED. Judgment shall enter for the defendant.

---

**8.** In the absence of any independent corroboration, the ALJ did not credit Torres' subsequent purported difficulties with these activities. (TR at 26)