**Darleen M. ARRUDA, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner, Social Security Administration, Defendant.**

**No. CIV.A. 03–10344–MBB.**

United States District Court, D. Massachusetts.

April 12, 2004.

**54**

Morris Greenberg, Green, Greenberg & Nesselbush, Providence, RI, for Darleen M. Arruda, Plaintiff.

**MEMORANDUM AND ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 12); DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (DOCKET ENTRY # 15)**

BOWLER, Chief United States Magistrate Judge.

Pending before this court are cross motions by the parties, plaintiff Darleen M. Arruda ("Arruda") and defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("the Commissioner"). Arruda moves for a reversal of the decision of the Commissioner or, in the alternative, a remand under 42 U.S.C. § 405(g). (Docket Entry # 13). The Commissioner moves for an order affirming the denial of benefits. (Docket Entry # 15). Inasmuch as a hearing, which neither party requested, *see* LR. 7.1(d), is unnecessary, the matter is ripe for review.

## PROCEDURAL HISTORY

On April 24, 2000, Arruda, a 38 year old former home health aide and residential counselor, filed applications for supplemental security income benefits and disability benefits. In her applications under Title II and part A of Title XVIII of the Social Security Act, Arruda alleged that she has been disabled since March 24, 2000, due to gastroesophageal reflux disease ("GERD"), depression, anxiety attacks, hypertension, edema, asthma and diabetes mellitus. (Tr. 93 & 106).

On October 19, 2000, the Social Security Administration ("the SSA") denied Arruda's applications. The SSA determined that although Arruda does have GERD, asthma, diabetes mellitus, depression and anxiety which prevent her from doing her past job, she is not prevented from doing other work. (Tr. 57).

In December 2000, Arruda filed a pro se request for reconsideration. In a reconsideration disability report filed in conjunction with this request, Arruda additionally claimed she was disabled due to a herniated disk and sciatic problems with her right leg. On February 6, 2001, the SSA denied the request for reconsideration. On February 13, 2001, Arruda requested a hearing before an administrative law judge ("ALJ") and reiterated the diagnosis of two herniated disks and a hiatal hernia. (Tr. 64–65, 69, 129, 135, 360 & 362).

On December 17, 2001, with Arruda represented by counsel, the ALJ conducted a hearing. On April 12, 2002, the ALJ rendered a written decision finding that Arruda was not disabled within the meaning of sections 216 and 223 of the Social Security Act, 42 U.S.C. §§ 416 and 423. The ALJ further found that Arruda was not entitled to a period of disability or to disability insurance benefits, nor was she eligible for supplementary security income. (Tr. 16 & 23–26).

As set forth in the decision, the ALJ viewed Arruda's impairments as including back pain, depression and diabetes mellitus and that they impacted her ability to do basic work activities. While the ALJ found that the limitations did not meet or equal any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, the ALJ determined that Arruda's past work was beyond her residual functional capacity. The ALJ concluded, however, that there were jobs that exist in significant numbers in the regional and national economies which Arruda was able to perform. (Tr. 18 & 21–22).

On May 20, 2002, Arruda, represented by counsel, filed an appeal of the ALJ's decision. On December 20, 2002, the Appeals Council denied Arruda's request for review and affirmed the ALJ's conclusion thereby rendering it a final decision of the Commissioner. (Tr. 8 & 11–12). On March 11, 2003, Arruda filed the present action. (Docket Entry # 3).

Arruda asserts that the ALJ failed to give appropriate weight to the opinions of the treating physicians and the treating psychologist. She further contends that the ALJ failed to follow the proper standards for pain evaluation as set forth in *Avery v. Secretary of Health and Human Services*, 797 F.2d 19 (1st Cir.1986), and Social Security Ruling 96–7p. Finally, Arruda argues that the ALJ failed to make the findings required by certain regulations applicable to the functional limitations caused by her mental impairment. (Docket Entry # 13).

Examining the administrative record as required, *see Wilkins v. Secretary of Department of Health and Human Services*, 953 F.2d 93, 96 (4th Cir.1991) (limiting social security review to administrative record); 42 U.S.C. § 405(g), this court turns to the factual history.

## FACTUAL HISTORY

### A. *Background Information*

Born on September 18, 1965, Arruda is five feet seven or eight inches tall and weighs between 285 and 399 pounds.[1] She did not graduate from high school but did receive a graduate equivalency degree in June 1993. Arruda is licensed as a residential counselor, a home health aide, a nurse's aide and a foster mother. She completed the Massachusetts Approach to Partnership in Parenting training in March 1999 in order to qualify to foster or adopt children from the Department of Social Services. (Tr. 32, 93, 105, 112 & 124).

Arruda is single and has never been married. She lived by herself at 338 Mott Street in Fall River, Massachusetts at the time she applied for benefits. She has lived with her sister in a second floor apartment at 241 Barnes Street in Fall River since late 2000. (Tr. 31, 95, 105, 154 & 287).

Arruda worked as a nurse's aide, residential aide or home health aide at nursing homes through various agencies and in a homeless shelter between 1985 and 1992. She worked as a residential counselor in a group home from September 1992 until April 1996. Arruda's most recent employment was as a privately contracted personal care attendant in a group home for physically and mentally handicapped individuals. According to her testimony at the hearing, Arruda helped the eight individuals, ranging in age from 22 to 62, with

activities of daily living. She held this position from September 1998 to March 2000.[2] (Tr. 33, 98–99, 107, 115–122 & 139).

In the disability report that she filed with the SSA on April 24, 2000, Arruda stated that her conditions first began to bother her on April 6, 1988. According to Arruda, she stopped working as a personal care attendant on March 24, 2000, because she could not lift the patients and needed a less stressful environment. She also indicated that prior to leaving her job she worked fewer hours, altered her job duties and made changes in attendance because of her injuries. At the hearing, Arruda testified that she "went to light duty" because of her injuries from a fall at work but still could not keep up with workload. Because her doctor advised her not to perform her job, Arruda asked for extended sick leave. Her employer, however, refused and Arruda quit citing medical reasons, according to her testimony. (Tr. 33–36 & 106).

At the hearing, Arruda testified that it is a physical challenge for her just to take care of her own needs throughout the day. She asserted that the medications she takes cause her to be "out of it" (Tr. 37) and estimated that it takes her an hour to prepare an egg sandwich for breakfast. She further testified that her sister will "set her up" in the morning by preparing her a bath if needed before going to work. Arruda stated that she generally stays home all day watching television and sleeping because of the pain and the medications. She nevertheless estimated that

---

**1.** In her April 24, 2000 application for benefits, Arruda indicated that she weighed 300 pounds. The record notes that she weighed as much as 399 pounds before losing 100 pounds prior to injuring her back. She regained some weight after the injury. She then increased her level of activity and reportedly lost 75 pounds sometime in 2001. Records from the South Coast Spine Center indicate that Arruda weighed 300 pounds in

November 2001. (Tr. 33, 105, 153, 321, 338 & 343).

**2.** Arruda indicated that she held the position as a personal care attendant until April 2000 in the work history report filed in conjunction with her application for benefits. An earnings report filed in the record, however, indicates that Arruda had no income in 2000. (Tr. 98 & 115).

she usually leaves home about three times a week to visit friends, go shopping or attend doctor's appointments. Arruda testified that she shops with her sister but that she is only able to walk down two or three aisles in a store before she must return to the car while her sister completes the shopping, bagging and carrying of the groceries. She also indicated that she does dishes while sitting in a chair and prepares sandwiches but is unable to cook things like pasta because she cannot carry the pot. Arruda testified that she drove to the hearing. (Tr. 36–39).

On an SSA questionnaire regarding her activities of daily living completed on June 8, 2000, Arruda noted that she prepares lunch and dinner for herself three times a week, making microwave meals and fast foods. She indicated that she needs assistance picking up heavy pans and has difficulty standing for long periods of time, bending over to put food in the oven or picking up items that she drops on the floor. Arruda also noted that she does household jobs such as washing dishes, dusting and folding laundry from a chair. She receives help from family members with other chores that require lifting and walking back and forth. She indicated that she goes shopping "one time bi-weekly" with her sister or a friend. (Tr. 125). On good days, Arruda will drive to the shopping. Arruda also indicated that she watches television throughout the day and night, although she asserted that she has trouble concentrating on what she watches because of stress and pain in her legs and back. She also looks through magazines and reads the newspaper for about five minutes. She expressed an interest in a wide range of activities, including doing crafts, going to flea markets and renovating homes and furniture. She asserted, however, that she could not do these activities anymore because of her physical and emotional problems. Arruda further indicated that she eats out and visits friends socially, although she now ends the visits early because of her condition. (Tr. 124–126).

In a December 2000 request for reconsideration of her disability due to the recently diagnosed herniated disk, Arruda described a similar picture. Therein, she described her diabetes as "uncontrolled" and that she "cannot shop for [a] long time ... cannot carry groceries or put them away without assistance, cannot unload or carry laundry, cannot walk or climb stairs holding anything because [she] needs bars to pull up stairs, [she is] restricted bending up and down because of pain and swelling ...." (Tr. 130). Arruda further indicated that she cannot carry heavy objects, vacuum or mop the floor, or sit in the tub and get out without assistance. She also noted that she must sit down while cooking, washing dishes or dressing. (Tr. 130).

B. *Medical History*

In her applications and in her testimony before the ALJ, Arruda maintained that she is disabled and suffering from a back injury, anxiety, depression, diabetes mellitus, asthma, hypertension and GERD. On April 22, 2000, Diane Patrick, M.D. ("Dr. Patrick"), Arruda's treating physician, completed a medical report for the Massachusetts Department of Transitional Assistance. On the form, Dr. Patrick diagnosed Arruda with diabetes mellitus, GERD, anxiety, depression and hypertension. She indicated that Arruda was unable to work for approximately three months because she needed an "un-stressful environment." (Tr. 203). She characterized Arruda's prognosis as "good." (Tr. 204).

On May 8, 2000, Arruda reported to Dr. Patrick that she had injured her back in a fall at work in December 1999 but had continued to work after that injury until March 2000. Dr. Patrick noted that on examination Arruda had diffuse lumbar tenderness. A straight leg raise test was

positive at 70 degrees, although she had a full range of motion in her lumbrosacral spine. Dr. Patrick's records indicate that Arruda was tearful and appeared depressed yet declined a prescription for antidepressant medication. She preferred to see a counselor when she received insurance. Dr. Patrick diagnosed Arruda's conditions as poorly controlled diabetes mellitus, anxiety or depression, sciatica and chest pain of unknown origin. She suggested that Arruda have an electrocardiogram ("EKG") to evaluate her chest pain and a magnetic resonance imaging ("MRI") test to evaluate the sciatica. (Tr. 201 & 211).

Dr. Patrick also completed a Massachusetts Department of Transitional Assistance emergency aid medical report on May 8, 2000. On the form, Dr. Patrick indicated that Arruda had a physical and/or mental impairment meeting or equivalent to the department's standards or the SSA listing of impairments that was expected to last more than one year. She also indicated that Arruda needed insurance coverage to pursue further evaluation. Dr. Patrick listed Arruda's impairments as poorly controlled diabetes mellitus with sugar readings of 400, unstable angina and low back syndrome or sciatica. She further opined that as a result of these conditions, Arruda could walk less than 100 feet, could stand, sit or alternate between positions for less than one hour, could never bend or stoop, had significant leg restrictions and could not even occasionally lift or carry ten pounds. Dr. Patrick further noted that Arruda's mood problem moderately limited her ability to work at a constant pace without extraordinary supervision or to respond appropriately to changes in work routine or environment. She nevertheless opined that Arruda was not limit-

ed in her ability to remember and carry out simple instructions and only slightly limited in maintaining attention and concentration, making simple work decisions and interacting appropriately with coworkers and supervisors. (Tr. 207 & 209–210).

On May 25, 2000, Arruda was admitted to Charlton Memorial Hospital in Fall River complaining of chest pain. Upon examination, the emergency room physician described the pain as located on the left side of the chest and characterized by tightness and a sensation "like a charlie [sic] horse." (Tr. 160). He further noted that the onset of the pain was during emotional upset. His clinical impression expressed doubt that the pain was caused by cardiac ischemia and opined that it might be caused by anxiety. Notably, he described Arruda's extremities as non-tender with a normal range of motion. (Tr. 159–164).

On May 27, 2000, Charles Mandell, M.D. reported the results of Arruda's radiological exam at the hospital. He noted that there were no significant abnormalities of the heart or lungs and identified no visualized bony structures. He concluded that Arruda's examination was normal. (Tr. 162).

On June 13, 2000, Arruda saw Dr. Patrick again regarding back pain. Dr. Patrick's notes indicate that Arruda reported the pain as traveling down the left leg without numbness. Dr. Patrick noted diffuse lumbar tenderness, an ability to flex ten degrees while walking and positive straight leg raising at 70 degrees for her left leg and 50 degrees for her right leg. (Tr. 212).

In June 2000, an examiner completed a medical evaluation sheet on behalf of the Massachusetts Disability Determination Services ("DDS").[3] The examiner noted

---

**3.** The signature on the vocational analysis form is illegible and the name of the examin- ing physician is not provided elsewhere in the

that Arruda's alleged impairments of GERD, diabetes mellitus, hypertension, asthma, obesity, depression and anxiety were not severe impairments. It was also noted that there was no evidence of target organ damage from diabetes mellitus or hypertension.[4] (Tr. 140).

Arruda saw Dr. Patrick again on August 8, 2000. Dr. Patrick noted that Arruda complained of trouble getting around, difficulty walking, fluid retention, aching legs, back pain and associated right leg pain. Arruda indicated that she had gone to court the previous week and had gotten upset but that taking Ativan had helped her feel better. Dr. Patrick also noted edema in the thighs, diffuse lumbar tenderness and tenderness of the right leg. Arruda's straight leg raise test was positive at 80 degrees for her right leg. Dr. Patrick noted her impressions of Arruda's condition as edema, sciatica and diabetes mellitus. (Tr. 213–214).

Arruda returned to Dr. Patrick on August 24, 2000, still experiencing edema and GERD. Dr. Patrick's notes reflect that Arruda felt "better" and that her back was "a bit better." Although Dr. Patrick again noted diffuse lumbar tenderness, she indicated that Arruda had a full range of motion. (Tr. 214).

Arruda was admitted to Charlton Memorial Hospital again on September 5, 2000, complaining of chest pain that began the previous night. The emergency physician record indicates that Arruda's chest pain was characterized by pressure, tightness and aching in the center of her chest aggravated by anxiety and relieved by rest. The emergency room physician noted that the onset of the pain occurred with emotional upset and that the pain was mild at its worst and almost gone when Arruda was seen in the emergency room. The physician expressed doubt that Arruda's pain was related to cardiac problems and opined that anxiety, stress and hypertension might be the cause. Significantly, he also described the extremities as non-tender and Arruda as having a normal range of motion. (Tr. 166–168 & 215).

Arruda returned to the emergency room at Charlton Memorial Hospital on September 12, 2000, where she was examined by Richard Nunez, M.D. ("Dr. Nunez"). According to Dr. Nunez, Arruda's chief complaint was that she was being poisoned. He described Arruda as "an overweight woman resting in bed, in no acute distress." (Tr. 170). With a glucose level of 311, Dr. Nunez concluded that Arruda had poorly controlled diabetes mellitus and severe anxiety and suggested a social services consultation together with a follow up appointment with Dr. Patrick. Notably, the past medical history fails to reflect a lower back syndrome. Arruda was discharged from the hospital the same day. (Tr. 169–171).

On September 14, 2000, Michael J. Meuth, M.D. ("Dr. Meuth") examined Arruda in consultation at Charlton Memorial Hospital where she was admitted for evaluation after seeing Dr. Patrick with an episode of chest pain. She remained in the hospital until September 19, 2000. After conducting an EKG and noting her weight problem, Dr. Meuth concluded that her chest pain and shortness of breath were not of cardiac origin. (Tr. 173–174, 182 & 223).

record. This court identifies the individual as the examiner inasmuch as this is the manner the medical evaluation sheet refers to the individual. The individual, however, did not conduct an examination of Arruda thereby lessening the impact of the findings. *See* 20 C.M.R. § 404.1527(d)(1).

4. Susan B. Chipman, Ph.D. ("Dr. Chipman") signed the form as a consultant on October 16, 2000.

Dr. Patrick also examined Arruda on September 14, 2000, at the hospital. Describing Arruda as recently having "been under tremendous stress," Dr. Patrick noted that Arruda came to see her complaining of chest pain on the left side, occasionally radiating to the left arm with sweats and shortness of breath. Upon examination, Arruda's lungs were clear and her heart had a regular rate and rhythm. There were no back spasms. She also described Arruda as recently experiencing only "*some* low-back discomfort with radiation to the legs." (Tr. 177; emphasis added). Dr. Patrick concluded that Arruda should be kept for cardiac evaluation as she had several risk factors such as smoking, diabetes mellitus, hypertension and family history. She also added Actose to improve sugar control and increased Arruda's dosage of Lasix to improve her peripheral edema. (Tr. 176–178).

A September 14, 2000 radiological report concluded there was no evidence of intrathoracic disease. (Tr. 184). A second report detailing the results of a stress test, which Arruda tolerated "well," similarly revealed no arrhythmias or diagnostic EKG changes. (Tr. 185–187).

Dr. Meuth performed a cardiac catheterization test on September 18, 2000. After interpreting the test results, he opined that "her chest pain is not of a coronary disease nature." (Tr. 183). He did not see the need for further testing and simply recommended that Arruda stop smoking and begin lifestyle modifications such as exercise and dietary changes. (Tr. 182–183).

In the September 19, 2000 discharge report, Dr. Patrick described Arruda as "amubulatory" and only "*a bit limited* because of her back." (Tr. 175; emphasis added). Dr. Patrick further noted that

Arruda complained of diffuse low back discomfort with some radiation to the legs, but that there were no back spasms on examination and the results of straight leg raise testing were negative. Dr. Patrick also referred Arruda to the Diabetes Treatment Center at the hospital to manage her diabetes mellitus. Arruda attended the center on October 5, 2000, and only completed one part of the two part core curriculum.[5] (Tr. 175, 179–181, 188, 193, 223 & 237).

On September 27, 2000, James M. Slayton, M.D. ("Dr. Slayton") conducted a consultative examination of Arruda for DDS. In a telerecorded message of his findings created on September 30, 2000, Dr. Slayton noted that Arruda drove to the office without limitations, was approximately 20 minutes late and complained primarily of anxiety with panic attacks and anger. She reported that she fell at work on a wet floor in December 1999, landing on her buttocks and twisting her leg. She further noted she was scheduled for an open table MRI on September 29, 2000. Arruda indicated that despite her injury she had continued working on light duty at the residential homes between December 1999, when she was injured, and March 2000. She reported that in March 2000 she could no longer lift the residents because of back pain and sciatic pain in her leg. (Tr. 152).

Arruda reported to Dr. Slayton that she first became depressed in 1987 when her son was stillborn. Her most recent period of depression began in December 1999 when she had the fall at work. In addition to her back and the shame Arruda experiences for being on welfare, the other sources of stress stemmed from family issues. Dr. Slayton noted that Arruda has a history of panic attacks triggered when

---

**5.** According to a notice contained in the record, on November 20, 2000, Arruda failed to attend an additional appointment at the dia-

betes management program that had been scheduled through Dr. Patrick's office. (Tr. 237).

other people talk fast or when she talks about her health. Conversely, he described her interests as good and that she participates in activities such as crocheting and other arts and crafts. Arruda also indicated to Dr. Slayton that she had lost 100 pounds or more in the past year and recently gained 16 pounds. Arruda denied feelings of guilt and suicidal or homicidal ideation. Dr. Slayton described her case as "remarkable for no hospitalization or detoxification" and "[n]o psychotherapy or psychopharmacology."[6] (Tr. 153–154).

Dr. Slayton characterized Arruda as a "primarily anxious, well-developed, obese white female, appearing stated age." (Tr. 155). He described her speech as normal in rate, rhythm and volume and that it was goal directed, occasionally tangential and circumstantial, but that she eventually got to the point. His overall impression of Arruda's mental condition was that she had a history of dysthymic disorder and mixed personality traits including a prominent borderline component. He ruled out major depression and panic disorder. He estimated Arruda's current global assessment of functioning ("GAF") as 55. He placed Arruda's GAF during the last year as ranging from 55 to 80.[7] Dr. Slayton opined that Arruda would have a difficult time with coworkers and supervisors under routine work circumstances given her complicated personality traits. On the other hand, he opined she might do well retraining in a structured work setting that took into account her personality traits and multiple medical problems. (Tr. 155–156).

On October 16, 2000, Dr. Chipman completed a mental residual functional capacity ("mental RFC") form. She indicated that Arruda was "moderately limited" in her abilities to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods, to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting. Dr. Chipman further found that Arruda was "not significantly limited" in her abilities to understand and remember detailed instructions, carry out very short and simple instructions or detailed instructions, to work in coordination with or proximity to others without being distracted by them, to get along with coworkers without distracting them or exhibiting behavioral extremes and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Chipman found "no evidence of limitation" in the other categories listed in the assessment form.

The mental RFC also contains an elaborate narrative and explanation to support Dr. Chipman's findings. After describing Arruda, including her history of depression and current anxiety attacks, her education and her work history, the narrative reads as follows:

---

6. Dr. Slayton's findings provide support for the ALJ's explanation discrediting the opinion of Dr. Charles Howland, Ph.D., on the basis that Arruda "has never required hospitalization, or crisis intervention for reasons related to mental impairment, has not been treated aggressively, and in fact, appears to have received no treatment from any mental health professional." (Tr. 21).

7. A GAF ranging between 51 to 60 indicates an individual with moderate psychological symptoms or moderate difficulty in social or occupational functioning. American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders* § 32 (1994). A higher rating within the range shows a less severe difficulty.

Anxiety and characterological issues would compromise her concentration, pace, stress tolerance and, likely, interpersonal relationship with supervisors. [Arruda's] cognition and memory functions adequate ... She reports some "confused" concentration and would have difficulty with tasks requiring clear focus and careful, sustained concentration. Combination of medical problems and anxiety would slow her pace at times. She is angry at her rejecting mother and would likely have difficulty with supervisor who was excessively critical. Overall less-demanding situation helpful.

(Tr. 142–143).

In a psychiatric review technique form ("PRTF") also completed on October 16, 2000, Dr. Chipman diagnosed Arruda as suffering from medically determinable impairments but that the impairments did not precisely satisfy the diagnostic criteria to constitute an affective disorder under section 12.04, an anxiety related disorder under section 12.06 or a personality disorder under section 12.08.[8] See 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06 & 12.08. In rating Arruda's functional limitations, Dr. Chipman found that Arruda had only a "mild" restriction of activities of daily living, "moderate" difficulties in maintaining social functioning and "moderate" difficulties in maintaining concentration, persistence or pace. There was "insufficient evidence" for a determination regarding repeated episodes of decompensation. (Tr. 149).

On October 17, 2000, the same examiner who completed the June 2000 evaluation sheet filled out a vocational analysis form on behalf of DDS. The examiner found that Arruda's past work was precluded by the mental RFC because it required high stress. The examiner stated that Arruda's "anxiety and other issues will compromise concentration, pace, stress tolerance and interpersonal relationships." (Tr. 128). He nevertheless opined that vocational rule 204 would direct a finding that Arruda was not disabled. The examiner explained his finding with some detail as follows:

[Arruda] has no physically significant impairments and no mentally significant impairments that would preclude performing unskilled occupations. Given [Arruda's] vocational profile accommodation would be expected to such fields of work in Massachusetts as the cleaning services with 75,000 positions or the packing and inspecting occupations with 15,000 positions.

(Tr. 128).

On October 30, 2000, Arruda saw Dr. Patrick for a follow up. Dr. Patrick reviewed her glucose levels, dietary intake and fluids. She noted that Arruda complained of sleepiness attributed to Buspar and that she was still smoking half a pack of cigarettes a day. Dr. Patrick also observed that Arruda had a stiff gait and indicated that she used a cane on stairs. Dr. Patrick again noted that Arruda had diffuse lumbar tenderness and edema. Her impression was that Arruda's diabetes mellitus was improved but that she still had anxiety. (Tr. 219–220).

Dr. Patrick referred Arruda to Stephen Howard Karshbaum, M.D. ("Dr. Karshbaum") at the Fall River–New Bedford Regional MRI Center ("MRI Center") in order to obtain an MRI. The MRI, conducted on November 9, 2000, revealed a "large disc extrusion" extending inferiorly "at the L4 L5 level." (Tr. 157). Dr.

**8.** In determining the existence of a disabling impairment, the psychiatric review form is primarily used during steps two and three of the sequential process whereas the mental RFC is primarily used during steps four and five. See Dudley v. Barnhart, 2002 WL 449699 at * 2 (D.Me. March 25, 2002).

Karshbaum also noted the presence of disc dessication, endplate discogenic reactive changes and described the inferior aspects of the bilateral neural foramina as mildly narrowed. He found no other areas of disc herniation, spinal canal narrowing or neural foraminal narrowing. (Tr. 157–158).

On December 11, 2000, Dr. Patrick saw Arruda and noted that she complained of increased fluid retention. Arruda's back was "the same" and her glucose levels were "better." (Tr. 221). In response to Arruda's interest in losing weight, Dr. Patrick prescribed Meridia. Dr. Patrick indicated that she had reviewed Arruda's MRI and noted the problem with the disk and planned to obtain an evaluation by a neurosurgeon. (Tr. 221–222).

At the request of Dr. Patrick, Leslie Stern, M.D., Ph.D., F.A.C.S. ("Dr. Stern"), a neurosurgeon, examined Arruda on January 16, 2001. According to Dr. Stern's letter to Dr. Patrick, Arruda described her pain as "not consistently severe, but tending to wax and wane in severity . . . worse with activity and somewhat improved by rest." (Tr. 273). He noted that she takes Vicodin for the pain. On examination, Dr. Stern observed that Arruda walked slowly but steadily and that the power in her lower extremities was normal. Deep tendon reflexes were silent. He noted that a sensory examination revealed a diminution of pinprick sensation in Arruda's lower right leg "in a nondermatomal distribution." (Tr. 273). Dr. Stern performed a straight leg raising test which was positive at 40 degrees on the left leg and 20 degrees on the right leg. The peripheral pulses, however, were good. Reviewing the MRI, Dr. Stern noted the "herniation at L4–5" as well as "considerable degenerative change at the disc space itself." (Tr. 274). Surgery, however, would prove difficult due to Arruda's "large size." (Tr.

274). Accordingly, he recommended that Arruda undertake a weight loss program and that he would consider such surgery "if she can get down to a more acceptable weight." (Tr. 273–274).

In conjunction with Arruda's request for reconsideration, a DDS examiner prepared a medical evaluation sheet on January 22, 2001. Saro Palmeri, M.D. ("Dr. Palmeri") signed the evaluation sheet as a consultant on January 23, 2001. The evaluation indicated that Arruda's conditions of hypertension, chest pain syndrome, diabetes mellitus, GERD and mild asthma were not severe impairments. Dr. Palmeri did consider Arruda's back pain and disc disease severe impairments. (Tr. 241).

Dr. Palmeri completed a physical residual capacity assessment ("physical RFC") form on January 23, 2001. He provided a primary diagnosis of a discogenic or lumbar disorder, a secondary diagnosis of diabetes mellitus and hypertension and also noted Arruda's problem with obesity. In assessing Arruda's exertional limitations, Dr. Palmeri opined that she could occasionally lift 20 pounds and frequently lift and carry ten pounds. He further opined that Arruda could stand and/or walk for about six hours in an eight hour workday, sit for approximately six hours in an eight hour workday and that her ability to push or pull was unlimited. Dr. Palmeri noted that Arruda "undoubtedly is limited as much by the obesity as by LBP [low back pain]." (Tr. 244). Dr. Palmeri opined that Arruda would only occasionally experience all of the listed postural limitations, including climbing, balancing, stooping, kneeling, crouching and crawling. Dr. Palmeri found no manipulative, visual, communicative or environmental limitations.[9] (Tr. 242–249).

9. Dr. Palmeri's assessment provides support for the ALJ's findings.

On January 29, 2001, after a DDS examiner completed a psychological medical evaluation sheet, S. Fischer, Psy.D. ("Dr. Fischer") completed a mental RFC and a PRTF. Turning to the mental RFC, Dr. Fischer, a nonexamining physician, opined that Arruda's ability to remember locations and work like procedures and her abilities to understand, remember and carry out very short and simple instructions were "not significantly limited." Likewise, Dr. Fischer found no significant limitation in Arruda's ability to: (1) sustain an ordinary routine without supervision; (2) work in coordination with or in proximity to others without distraction; (3) make simple work related decisions; (4) interact appropriately with the general public; (5) ask simple questions or request assistance; (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (7) be aware of normal hazards and take appropriate precautions; (8) travel in unfamiliar places or use public transportation; and (9) set realistic goals or make plans independently of others. Dr. Fischer classified Arruda as "moderately limited" in her ability to perform the following functions: (1) understand, remember and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 251–253).

In the PRTF, Dr. Fischer diagnosed Arruda with dysthymia, anxiety disorder and personality disorder and noted the correlating listings for these disorders.

See 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06 & 12.08. Arruda's impairments, however, did not precisely satisfy the diagnostic criteria for these listings. Dr. Fischer's ratings in the four categories of functional limitation are identical to Dr. Chapman's ratings in the October 2000 PRTF. Dr. Fischer rated Arruda's functional limitation as "moderate" vis-à-vis the categories of maintaining social functioning and concentration, persistence or pace and "mild" vis-à-vis the category of activities of daily living. Dr. Fischer concluded there was "insufficient evidence" for a finding regarding episodes of decompensation. (Tr. 255–266).

Dr. Patrick conducted another examination of Arruda on February 1, 2001. Dr. Patrick described Arruda as tearful but controlled when talking about the situation in her home. Although noting that Arruda had temporarily stopped taking Vicodin, Dr. Patrick made no notations of diffuse lumbar tenderness or leg pain. She also limited her impression to diabetes mellitus and edema. (Tr. 298).

Shortly thereafter, however, on February 6, 2001, Arruda's statement in conjunction with her request for a hearing contains the diagnosis of "two herniated back disks [and a] hiatal hernia, both unoperative [sic] because of obesity and diabetes and blood pressure problems." (Tr. 135). She also stated that she has sciatic nerve problems in her right leg and severe pain in her back and right leg. (Tr. 135).

Upon a referral from Dr. Patrick, Sanford W. Udis, M.D., a radiologist, examined Arruda regarding her heartburn on February 7, 2001. He completed an upper gastrointestinal series examination and diagnosed a hiatal hernia. (Tr. 285).

On April 26, 2001, Dr. Patrick examined Arruda again. While noting continuing problems with edema, the notes reflect an improvement in Arruda's glucose levels.

Dr. Patrick described Arruda as "calm" albeit with diffuse lumbar tenderness. (Tr. 300–301).

On April 30, 2001, Dr. Stern completed a series of brief forms, to wit, a one page physical capacity evaluation, a pain questionnaire and a medical questionnaire. These forms contrast with findings in the January 16, 2001 letter Dr. Stern wrote to Dr. Patrick summarizing his findings of the examination of Arruda conducted that same day. The January 16, 2001 examination was the only time Dr. Stern examined and treated Arruda. (Tr. 269).

In the physical capacity evaluation form, Dr. Stern noted that Arruda could not sit, stand or walk at all in an eight hour workday. He indicated that Arruda could never lift or carry even items weighing up to five pounds and was never able to bend, squat, kneel or crawl. (Tr. 267). In the six question pain questionnaire, Dr. Stern identified Arruda's impairment as a disc herniation that could reasonably be expected to produce significant pain. He described the degree of pain as "moderate" as opposed to "severe." The pain would nevertheless preclude "sustained concentration and productivity which would be needed for full-time employment on an ongoing sustained basis." (Tr. 268). On the medical questionnaire, Dr. Stern limited his diagnosis of Arruda to the lumbar disc herniation. He classified the severity of the symptoms in her back and right leg as "moderate." In conclusion, he opined that Arruda could not sustain competitive

employment on a full time, ongoing basis. (Tr. 270).

On May 18, 2001, Arruda completed a form detailing her current medications. She indicated that she was presently taking Zaroxlyn for water retention and edema, Vicodin for back pain, Buspar for anxiety attacks, "K–Dur" to supplement her potassium, Verapamil for high blood pressure, Humalog for diabetes control, Ativan for anxiety attacks and chest pain, Pericolace for intestinal blockage and constipation, Lasix for water retention and edema, Allegra for allergies, an Albuterol inhaler for asthma, enteric aspirin, fiber tablets for blockage and gas and Tums for acid indigestion. (Tr. 272).

Dr. Patrick examined Arruda again in June or July 2001. Dr. Patrick's notes indicate that Arruda's glucose levels were better, averaging less that 200, but that she still complained of ongoing back pain and experienced anxiety. Although Dr. Patrick observed diffuse lumbar tenderness, Arruda had a full range of motion. (Tr. 303).

Charles Howland, Ph.D. ("Dr. Howland"), referred by Arruda's attorney, conducted a psychological evaluation on August 8, 2001. According to Dr. Howland, Arruda reported that she had fallen at work in November 1999 and ruptured several disks in her back.[10] Arruda also told Dr. Howland that she had a heart attack in April 2000.[11] She further indicated that she had become increasingly depressed and anxious after she injured her back,

10. As noted *supra,* Arruda had indicated in her applications and her reports to Dr. Patrick that she had injured her back in December 1999. Also, Dr. Patrick, Dr. Karshbaum and Dr. Stern concurred that Arruda had a herniated disc at L4–5, not multiple ruptured discs as Arruda indicated to Dr. Howland.

11. There is no evidence in the record of Arruda suffering a heart attack in April 2000. She

was hospitalized on May 25, 2000, for chest pain, but the emergency room physician and a radiologist concluded that Arruda's heart was normal and her chest pain was likely caused by anxiety.

While the ALJ credited a portion of Arruda's testimony in his decision, he did "not find her fully credible." (Tr. 20). Substantial evidence supports the ALJ's assessment of Arruda's credibility.

experiencing symptoms such as depressed and anxious moods, frequent crying spells, chest pain, shortness of breath and rapid heartbeats. (Tr. 286).

Dr. Howland observed that Arruda was neatly dressed and adequately groomed and that her use of language appeared consistent with her level of education. He noted that her affect was constricted, her mood anxious and depressed and that she cried several times during the evaluation. Arruda admitted thoughts of worthlessness but denied any suicidal ideation or the presence of psychotic symptoms. Dr. Howland noted difficulty "with tasks sensitive to problems with attention and concentration," such as counting in serial threes or remembering a series of numbers forwards or backwards. (Tr. 287). On the other hand, he described her reasoning as "quite concrete" and her cognitive functioning as "within the low average range." (Tr. 287). Testing likewise suggested a level of cognitive functioning in the low average range. Dr. Howland proffered a diagnosis of major depression (single episode) and moderate panic disorder without agoraphobia. He placed her GAF at 57. He characterized Arruda's prognosis as guarded at best due to the chronic physical complaints, the somewhat limited cognitive abilities and the anxiety and depression. (Tr. 286–288).

Dr. Patrick examined Arruda again on October 1, 2001. Dr. Patrick's notes indicate that Arruda continued to have anxiety, GERD and edema. She noted the completion of the psychological evaluation and that no medications were suggested. The notes additionally reflect the clinical impression of a lower back syndrome and a prescription for Vicodin. (Tr. 305).

Dr. Patrick referred Arruda to Douglas R. Johnson, M.D. ("Dr. Johnson") to better evaluate Arruda's lower back pain. During Dr. Johnson's October 30, 2001 examination, Arruda described her pain as radiating "in a band around the low back . . . burning, aching and stabbing spasms as well as some aching pain in the neck . . . some numbness in the legs and occasionally drags the legs." (Tr. 321). Arruda also described her physical activity as "very limited." (Tr. 321). On examination, Dr. Johnson noted that Arruda was "very obese" and weighed close to 300 pounds. He further noted that she had a "very limited range of motion" and chronic bilateral edema. Dr. Johnson performed a straight leg raising test which was positive at 50 degrees on the right side and 35 degrees on the left side. Her strength proved normal with "no substantial neurological defects" or spinal instability. (Tr. 322).

As a result of the examination, Dr. Johnson prescribed a rehabilitation program to gradually increase Arruda's flexibility and strength. He advised limited lifting and a program of physical therapy three time per week for four to six weeks. The suggested goals for the program were to normalize Arruda's lumbar flexibility, back strength, endurance and lifting ability. Dr. Johnson cautioned against anterior loading in excess of 20 pounds. (Tr. 338).

On November 7, 2001, Susan Sherman ("Sherman"), a licensed physical therapist at the South Coast Wellness Center in North Dartmouth, Massachusetts, completed forms detailing Arruda's initial treatment plan and the examination. Sherman's initial assessment demonstrated that Arruda was currently able to walk for 15 minutes three times per week, stand for ten minutes at a time and sit with back support for over an hour or without back support for less than 20 minutes. The record contains treatment notes from November 14, November 15 and November 19 indicating that Arruda repeatedly cancelled and rescheduled her therapy appointments.

Notably, Arruda indicated to a physical therapy assistant on November 21, 2001, that she performed exercises in bed for her legs with a five pound weight. The assistant stated that Arruda tolerated her treatment well, including testing on a treadmill, modified roman chain and pile, lateral pull down, four-way hip and rowing exercises with a "T-band" and "bridging" with a ball. (Tr. 349). The record fails to contain further treatment notes regarding Arruda's physical therapy. (Tr. 340 & 345–349).

On December 7, 2001, Dr. Howland completed a short emotional impairment questionnaire as well as a supplemental RFC. The former document reflects that Dr. Howland saw Arruda twice, once on August 8, 2001, and again on October 3, 2001. He described her as suffering from an emotional impairment which significantly limited her ability to engage in substantial gainful activity in a competitive setting on a full time, ongoing basis. Dr. Howland listed Arruda's impairments as single episode major depression and moderate panic disorder without agoraphobia. He also briefly described her symptoms as including anxiety, depression, "crying spells" and "thoughts of worthlessness." He rated her symptoms as "severe." (Tr. 296).

In a supplemental RFC, Dr. Howland rated Arruda's impairments along a five point scale ranging from "none" to "severe." He classified her ability to respond to work pressures and perform complex tasks as "severe." Dr. Howland rated three categories as "moderately severe," to wit, ability to relate to other people, restrictions of daily activities and ability to respond appropriately to supervision. Dr. Howland classified as "moderate" Arruda's ability to understand, carry out or remember instructions and her ability to perform simple, repetitive or varied tasks. He rated as "mild" the following categories: (1) deterioration of Arruda's personal habits;

(2) constriction of interests; and (3) ability to respond appropriately to coworkers. (Tr. 318–319).

On January 9, 2002, Dr. Patrick completed the same three forms that Dr. Stern completed in April 2001. In response to the question in the physical evaluation form regarding Arruda's total capacity for sitting, standing and walking in an eight hour workday, Dr. Patrick circled zero for each category. She also indicated that Arruda could sit and/or stand at her discretion for one hour at a time. Dr. Patrick opined that Arruda could occasionally or frequently lift and carry up to ten pounds. She noted that Arruda could use her arms and hands for repetitive grasping, reaching and fine manipulation but not for pushing and pulling. Dr. Patrick also indicated that Arruda could never bend, squat, kneel or crawl. (Tr. 323).

On the pain questionnaire, Dr. Patrick classified Arruda's pain as "severe." (Tr. 324). She limited the diagnosis of a medically determinable impairment to lumbar disc disease as opposed to diabetes mellitus or any of Arruda's other ailments. Like Dr. Stern, she concluded that the severity of the pain would preclude "sustained concentration and productivity which would be needed for full-time employment on an ongoing sustained basis." (Tr. 324). On the medical questionnaire, Dr. Patrick again limited the diagnosis to lumbar disc disease located at L4 to L5. (Tr. 325–326).

C. *ALJ Hearing*

At the December 17, 2001 hearing, the ALJ heard testimony from Arruda summarized *supra* and from an impartial vocational expert ("VE"). After exploring Arruda's living arrangements, educational background and efforts to lose weight, the ALJ questioned her in depth about her work history, job requirements and the

circumstances under which she became injured and ceased her employment. He comprehensively questioned Arruda about the effect of her condition on her ability to work, her medical problems, her various doctors and medications and her daily activities. (Tr. 31–43). When the ALJ questioned Arruda about her current physical capacity for walking, standing and sitting, she responded that she could not walk any further than to her car in the parking lot and that she could stand comfortably for 15 minutes and sit comfortably for 30 minutes. (Tr. 33–43).

When questioned by her attorney, Arruda testified that she lies down for at least eight to ten hours in a day and has difficulty sleeping at night because of the pain. She explained that changes in her routine make her upset and cause her to cry. She also stated that the medication for anxiety makes her "like a zombie ... you're in another world." (Tr. 45). The pain medications dull her pain to an ache but if she neglects to take them, the pain becomes excruciating. In response to questions about her diabetes mellitus, Arruda testified that her glucose "crashed" or went up and down drastically every day and that she either eats or takes insulin to normalize the glucose levels. She also expressed a belief that she would have problems getting along with others at work, including supervisors, and that she would have trouble with work related stress. (Tr. 43–48).

After reviewing the record and hearing testimony concerning Arruda's medical complaints and limitations, the ALJ asked the VE for an assessment of the skill and exertional levels of Arruda's past work. The VE classified the positions as skilled or semiskilled with "heavy to very heavy" or "medium" exertional requirements or levels. (Tr. 49–51). The ALJ then posed the following hypothetical to the VE:

> ... Consider a hypothetical claimant the same age, education, work experience of [Arruda] with a residual functional capacity for sedentary work, but requiring an option to sit or stand at her will, and further limited by inability to engage in work requiring understanding, remembering, carrying out complex or detailed job instructions and moderate reductions in maintaining attention and concentration and dealing with the public or coworkers or supervisors or dealing with ordinary expectations of attendance, perseverance or pace.

(Tr. 51).

The VE responded that those limitations would rule out Arruda's past work. Significantly, however, he identified 1,500 assembler jobs, 600 inspector jobs and 1,000 hand packager jobs in Rhode Island and southeastern Massachusetts which could be performed under the limitations provided in the hypothetical. The VE then testified that if any of the limitations described by the ALJ as moderately limited were instead moderately severely limited or severely limited, the jobs that he had identified would be precluded. (Tr. 51–52).

### D. ALJ Decision

On April 12, 2001, the ALJ issued a written decision wherein he comprehensively reviewed and evaluated the medical and vocational evidence. He found that the medical record showed that Arruda experienced "back pain, obesity, depression and diabetes mellitus." (Tr. 18). As a result, he concluded that she had a severe medically determinable impairment. None of the impairments alone or in combination, however, met or equaled a listed impairment. (Tr. 17–18).

Although acknowledging the legitimacy of her symptoms, the ALJ found that Arruda's "pain [was] not so severe as to produce the inability to engage in virtually any activity that she alleges." (Tr. 20). He explained that her statements concern-

ing her impairments and their impact on her ability to work were not entirely credible in light of her ability to maintain a household and provide for her personal needs. In addition, the ALJ afforded reduced evidentiary weight to Dr. Howland's opinion that Arruda "suffers disabling mental limitations" because the opinion was "supported neither by his own findings and estimates of functional impairment nor by the medical [sic] as a whole . . . ." (Tr. 20–21). The ALJ also afforded "little evidentiary weight" to the opinions of Dr. Patrick and Dr. Stern because their opinions regarding Arruda's residual functioning capacity were not supported by other evidence of record, particularly the notes from Arruda's physical therapist and the inferences drawn from Arruda's daily activities. (Tr. 20–21).

The ALJ indicated that Arruda retains the residual functional capacity for a wide range of sedentary occupations that would allow an option to sit or stand at will. He found that Arruda is further affected by moderate limitations in her ability to maintain attention and concentration, deal appropriately with the public, with coworkers and supervisors and deal appropriately with the ordinary requirements of attendance, perseverance and pace. He also found that she is affected by a severe restriction on her ability to understand, remember and carry out detailed instructions.

The ALJ found that Arruda's past relevant work as a residential counselor, group home attendant and nurse's assistant were therefore beyond her functional capacity. He found, however, that there are jobs which exist in significant numbers in the regional and national economies which Arruda is able to perform. Accordingly, the ALJ concluded that Arruda was not disabled. (Tr. 20–23).

### DISCUSSION

The standard of review of the Commissioner's decision is prescribed by statute. Under 42 U.S.C. § 405(g), the court has the power to affirm, modify or reverse the Commissioner's decision, with or without remanding the case for a rehearing. As stated in 42 U.S.C. § 405(g), "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." The court therefore determines "whether the final decision is supported by substantial evidence and whether the correct legal standard was used." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir.2001). Substantial evidence is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *accord Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 222 (1st Cir.1981) (findings upheld if a reasonable mind, reviewing record as a whole, would accept it as adequate to support the Commissioner's conclusion); *accord Dedis v. Chater*, 956 F.Supp. 45, 49 (D.Mass.1997).

Thus, under 42 U.S.C. § 405(g), review of the Commissioner's decision is not *de novo*.[12] *Lizotte v. Secretary of Health and Human Services*, 654 F.2d 127, 128 (1st Cir.1981). " '[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Secretary.' " *Lizotte v. Secretary of Health and Human Services*, 654 F.2d at 128 (quoting *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d at

---

**12.** Indeed, if this court reviewed the case *de novo*, it would conclude that Arruda was disabled.

222). It is also the responsibility of the Commissioner, not the courts, to resolve conflicts in the evidence. *Irlanda Ortiz v. Secretary of Health and Human Services,* 955 F.2d 765, 769 (1st Cir.1991). Accordingly, even if the record can justify a contrary conclusion, this court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Evangelista v. Secretary of Health and Human Services,* 826 F.2d 136, 144 (1st Cir.1987); *Rodriguez Pagan v. Secretary of Health and Human Services,* 819 F.2d 1, 3 (1st Cir.1987).

In the case at bar, the ALJ determined that Arruda was not disabled. The Social Security Act defines a disability as the:

... inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 416(i)(1) & 423(d)(1). "The impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy.'" *Deblois v. Secretary of Health and Human Services,* 686 F.2d 76, 79 (1st Cir. 1982) (quoting 42 U.S.C. § 423(d)(2)(A)).

The above statutory framework is implemented by applying a five step sequential analysis. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Goodermote v. Secretary of Health and Human Services,* 690 F.2d 5, 6–7 (1st Cir. 1982); 20 C.F.R. § 404.1520. The Commissioner first determines if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(b); *Cashman v. Sha-*

*lala,* 817 F.Supp. 217, 221 n. 5 (D.Mass. 1993). If so, the claimant is not disabled.

If the claimant is not engaged in substantial gainful activity, the Commissioner next determines if he or she suffers from a severe impairment or combination of impairments. A "severe impairment" is a condition that "significantly limits [the claimant's] physical or mental ability to perform basic work-related functions." *McDonald v. Secretary of Health and Human Services,* 795 F.2d 1118, 1120 (1st Cir.1986); *see* 20 C.F.R. §§ 404.1520(c) and 416.920(c) (defining "severe impairment"). The ability to perform basic work activities is defined as the ability and aptitude "to do most jobs." *Bowen v. Yuckert,* 482 U.S. at 141, 107 S.Ct. 2287 (abilities and aptitudes include walking, sitting, standing, lifting, seeing, hearing, speaking and understanding simple instructions).

If severe, the Commissioner proceeds to the third step and determines whether the impairment is equivalent to one of a number of listed impairments in the Code of Federal Regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. *McDonald v. Secretary of Health and Human Services,* 795 F.2d at 1120. If the impairment meets or equals a listed impairment, the claimant is automatically disabled.[13] 20 C.F.R. § 404.1520(d).

Under the fourth step of the sequential evaluation, a claimant is not disabled if "he or she retains the [residual functional capacity] to perform 'the actual functional demands and job duties of a particular past relevant job.'" *Santiago v. Secretary of Health and Human Services,* 944 F.2d 1, 5 (1st Cir.1991); 20 C.F.R. §§ 404.1520(e) & 404.1560(b). "At step four the initial burden is on the claimant to show that she can no longer perform her

**13.** As discussed *infra,* substantial evidence supports the ALJ's conclusions that Arruda had a severe impairment but did not suffer

from an automatically disabling listed impairment or an equivalent thereof.

former work because of her impairments." *Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d 15, 17 (1st Cir. 1996). The ALJ then must measure the physical and mental demands of that former work with the claimant's current functional capacity. *Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d at 17 ("Secretary must ascertain the demands of the usual former work and *then* compare those demands with present mental and physical abilities"); *Santiago v. Secretary of Health and Human Services,* 944 F.2d at 7.

The ALJ found that Arruda lacked the functional capacity to perform her past relevant work as a residential counselor or attendant or nurse's assistant, all skilled or semi-skilled positions requiring medium or heavy exertional work. Substantial evidence, including the VE's testimony at the hearing, supports this conclusion which neither party contests.

At the fifth and final stage, the Commissioner determines whether, in view of the claimant's exertional and nonexertional impairments, age, educational background and work experience, the claimant can perform other work in the national economy. *Bowen v. Yuckert,* 482 U.S. at 141–142, 107 S.Ct. 2287; 20 C.F.R. §§ 404.1520 & 416.20. It is the claimant's burden to prove that he or she is disabled within the meaning of the Social Security Act. *Ortiz v. Secretary of Health and Human Services,* 890 F.2d 520, 524 (1st Cir.1989). At the fifth step, however, the Commissioner has the burden to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart,* 274 F.3d 606, 608 (1st Cir.2001); *accord Heggarty v.*

*Sullivan,* 947 F.2d 990, 995 (1st Cir.1991) (burden is "on the Secretary to demonstrate that there are jobs in the national economy that claimant can perform").

At the fifth stage, the ALJ found that Arruda lacked the ability to perform the full range of sedentary work because she required an option to sit or stand and also had additional mental restrictions. (Tr. 22, ¶ 5). Accordingly, the ALJ posed a hypothetical question to the VE detailing at length these qualifications. In response, the VE testified to the presence of unskilled jobs in the economy. (Tr. 51–52).

■ Arruda first submits that the ALJ failed to give appropriate weight to the residual functioning capacity assessments and the opinions proffered by Arruda's treating physicians, Drs. Patrick and Stern. Arruda specifically points to the opinions of both Drs. Patrick and Stern that she could not sit, stand or walk for more than one hour. (Tr. 209, 267 & 323). These opinions are contained in physical capacity evaluation forms or similar questionnaires that each doctor completed by checking appropriate boxes to standard questions. An extended discussion does not accompany the reports.

Arruda acknowledges that the ALJ did not reject the assessments of Drs. Patrick and Stern outright.[14] *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271, 276 (1st Cir.1988) (affirming decision denying claim due to contradictory medical advisor evidence in the record and noting "this was not a case of wholesale rejection by the ALJ of the treating physician's opinion"). Rather, the ALJ expressly gave the opinions "little evidentiary

---

**14.** Indeed, if the ALJ rejected the findings outright, he would have accepted Dr. Chipman's and Dr. Fischer's respective assessments that Arruda was not significantly limited or only moderately limited in her ability to carry out detailed instructions (Tr. 141 & 251) instead of finding that Arruda "is affected by a severe restriction on her ability to understand[,] remember, and carry out detailed instructions." (Tr. 21).

weight" due to the lack of support in the record, citing specifically the physical therapy notes indicating a significant amount of weight loss from increased physical activity and the inferences drawn from Arruda's daily activities.[15] The ALJ additionally reasoned that Arruda's treatment "has been strictly conservative" and there was no evidence that Arruda "experiences any neurological deficits." (Tr. 21).

■ "The law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." *Arroyo v. Secretary of Health and Human Services*, 932 F.2d 82, 89 (1st Cir.1991); *accord Keating v. Secretary of Health and Human Services*, 848 F.2d 271, 276 (1st Cir.1988) ("treating physician's conclusions regarding total disability may be rejected by the Secretary especially when, as here, contradictory medical advisor evidence appears in the record"). "Controlling weight" is typically afforded a treating physician's opinion on the nature and severity of an impairment where it is "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the claimant's case. 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2). The relevant regulations further permit the ALJ to downplay the weight afforded a treating physician's assessment of the nature and severity of an impairment where, as here, it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians. 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)(2)-(4).

■ Dr. Stern examined Arruda only once in January 2001. Such a brief review warrants less weight than a review given by a physician such as Dr. Patrick who has a more longstanding relationship with Arruda and a more in depth knowledge of her ailments. *See* 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i) ("the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"). In addition, Dr. Stern's two page letter to Dr. Patrick wherein he notes that Arruda "walked slowly but steadily" and had normal power in her lower extremities (Tr. 273–274) contravenes his assessment in the physical capacity evaluation form that she could never lift or carry even up to five pounds of weight. (Tr. 267); *see* 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)(2)-(4). Dr. Stern's conclusions relative to the inability to sit, stand and walk are also inconsistent with the report itself which, as the ALJ recognized, only characterizes Arruda's pain as "moderate" as opposed to "severe." (Tr. 268). Finally, Dr. Stern's physical capacity evaluation form is a brief list of checked answers to form questions unaccompanied by explanation.[16] *See* 20 C.F.R. §§ 404.1527(d)(3) & 416.927(d)(3) ("[t]he better an explanation a source provides for an opinion, the more weight we will give to that opinion"); *see also Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) (characterizing the reliability of " 'residual functional capacity reports' " that " 'are unaccompanied by thorough written reports' " as " 'suspect' "); *Berrios Lopez v. Secretary of Health and Human Services*, 951 F.2d 427, 431 (1st Cir.1991) (providing greater credence to consulting non-examining physician's report given the

---

**15.** It is worth noting that Dr. Patrick's summary assessment in the January 2002 physical capacity evaluation form that Arruda could lift and carry up to ten pounds frequently (Tr. 323) parallels the ALJ's assessment that Arruda could perform sedentary work. *See* 20 C.F.R. § 404.1567(a) (defining "sedentary work" as "involving lifting no more than 10 pounds at a time").

**16.** In contrast, the form completed by Dr. Palmeri is more elaborate and detailed.

greater detail than was typical for such reports).

Similarly, Dr. Patrick's checked answers on the January 2002 physical capacity evaluation form that Arruda can never bend, squat, kneel or crawl or sit, stand or walk for more than one hour (Tr. 323) differs from her treatment notes. *See* 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)(2)-(4). Although, like Dr. Stern (Tr. 267), she circles answers indicating that Arruda lacks the ability to sit, stand or walk in an eight hour work day (Tr. 209 & 323), Dr. Patrick's treatment notes indicate otherwise. For example, the September 2000 discharge summary from Charlton Memorial Hospital signed by Dr. Patrick describes Arruda's condition as "ambulatory" and only "a bit limited because of her back." (Tr. 175). Emergency room examinations due to chest pain in May and September 2000 reflect a normal range of motion in the extremities which are described as "non-tender." (Tr. 161 & 167). While at times Dr. Patrick's treatment notes show an increase in back pain (Tr. 302) and the presence of diffuse lumbar tenderness (Tr. 300, 303, 305 & 306), she also records improvements in Arruda's lower back syndrome after examinations three different times in 2001. (Tr. 303, 305 & 306). Dr. Patrick's treatment notes also reveal that at one time Arruda stopped taking the pain reliever Vicodin although she requested an alternate pain reliever a few weeks later and subsequently resumed taking Vicodin. (Tr. 298, 299, 302 & 304–306). Dr. Patrick's treatment

notes additionally fail to record a consistent numbness in Arruda's legs associated with the diffuse lumbar tenderness.[17] Although Arruda reported "ongoing pain" in her back in the summer of 2001, Dr. Patrick's examination showed a full range of motion at the time. (Tr. 303).

The January 2002 form itself is internally inconsistent. For example, although Dr. Patrick checks the answer describing Arruda's pain as "severe," she simultaneously notes that Arruda can frequently carry and lift as much as ten pounds.[18] (Tr. 323).

Furthermore, the ALJ did not ignore the evidence of Arruda's difficulty in sitting, standing and walking. To the contrary, he took it into account by finding that Arruda could not perform the demands of the full range of sedentary work precisely because she required a sit-stand option. (Tr. 22 & 23). The ALJ likewise took the restrictions into account in framing the appropriate question to the VE and incorporated the restrictions into his finding that Arruda was not disabled.

The existence of other evidence in the record inconsistent with the opinions of Drs. Patrick and Stern that Arruda could not sit, stand or walk for more than one hour also justifies the ALJ's assessment of the record. The physical therapy notes show that in November 2001 Arruda recited performing exercises at home with five pound weights. Even though Dr. Johnson characterized Arruda's physical activity as "very limited," he simultaneously prescribed a physical therapy program with

---

**17.** The record is equivocal in this regard. Dr. Stern's January 2001 letter summarizing the examination notes that Arruda reports "paresthesiae [sic] in the leg" and that "the leg has given out on occasion." (Tr. 273). Upon examination, Dr. Stern noted a "diminution of pinprick in the right lower leg." (Tr. 273). In addition, Dr. Patrick's notes reflect that Arruda reported that her right leg drags if tired and pain traveled down her left leg in

June 2000 and down her right leg in August 2000. (Tr. 212, 213 & 336). Dr. Johnson's notes reflect that Arruda "complains of some numbness in the legs and occasionally drags the legs." (Tr. 321).

**18.** Dr. Patrick's January 2002 findings represent an improvement over her May 2000 findings that Arruda could not reasonably be expected to lift or carry ten pounds. (Tr. 209).

anterior loading no greater than 20 pounds, as opposed to 15 or ten pounds. (Tr. 321 & 338). Arruda tolerated the physical therapy exercises "well."[19] (Tr. 349).

Dr. Palmeri, a nontestifying, nonexamining physician, completed a physical RFC assessment in January 2001. Recognizing a primary diagnosis of discogenic lumbar disease and secondary diagnoses of diabetes mellitus and hypertension, Dr. Palmeri checked various boxes indicating that Arruda could sit, stand and walk for approximately six hours during an eight hour day.

■ Although usually the report of a nontestifying, nonexmaining physician does not, standing alone, constitute substantial evidence, "this is not an ironclad rule." *Rose v. Shalala,* 34 F.3d 13, 18 (1st Cir.1994). The amount of weight afforded an advisory opinion " 'will vary with the circumstances, including the nature of the illness and the information provided to the expert.' " *Gordils v. Secretary of Health and Human Services,* 921 F.2d 327, 328 (1st Cir.1990); *accord Rose v. Shalala,* 34 F.3d at 18 (same). Dr. Palmeri's report and, in particular, the explanation in answer to question number six (Tr. 243–244), provides a level of detail oftentimes absent in such reports. *See Berrios Lopez v. Secretary of Health and Human Services,* 951 F.2d at 431 (noting that report "contains more in the way of subsidiary medical findings to support his conclusions concerning residual functional capacity than is customarily found in the reports of consulting, nonexamining physicians").

In short, substantial evidence supports the ALJ's assessments relative to Arruda's ability to stand, sit and walk and the opinions of Drs. Patrick and Stern. Arruda's

argument to the contrary is unavailing in light of the aforementioned inconsistencies, Dr. Palmeri's opinion and explanation and the fact that the ALJ imposed a sit/stand option thereby recognizing, to a degree, the findings of Drs. Patrick and Stern in the physical capacity evaluations or equivalent forms.

Arruda's additional contention that the ALJ improperly interpreted raw medical data in finding that she could perform sedentary work is misplaced. Although the principle that the ALJ cannot interpret raw medical data is correct, the cases cited by Arruda are distinguishable because in the case at bar there is a physical RFC that supports and, in fact, goes beyond the ALJ's more conservative findings. *See Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (ALJ as lay person cannot interpret "raw medical data" and Dr. Mahoney's opinion that claimant suffered severe pain "was uncontroverted"); *Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d 15, 17 (1st Cir.1996) (ALJ "not qualified to interpret raw data" and "record contains no analysis of functional capacity by a physician or other expert"); *Perez v. Secretary of Health and Human Services,* 958 F.2d 445, 446 (1st Cir.1991) (ALJ not qualified "to interpret raw medical data" and "record did not contain any medical evaluation of claimant's physical residual functional capacity"). The ALJ did not substitute his lay opinion for the opinions of Drs. Patrick and Stern.

■ Arruda next asserts that the ALJ ignored the opinion of Dr. Howland and, instead, substituted his own lay opinion about Arruda's psychological well being.[20] In affording Dr. Howland's opinion "re-

---

19. On the other hand, the November 2001 physical therapy notes reveal a reported ability to walk for only 15 minutes three times a week, stand for ten minutes and sit for more than one hour with a back support.

20. Dr. Howland examined Arruda at the request of her attorney on August 8, 2001. (Tr. 286). He later saw Arruda for an initial assessment on October 3, 2001. (Tr. 289–293). There is no further indication of treatment

duced evidentiary weight," the ALJ correctly noted that Dr. Howland's opinion of a severe depression was inconsistent with his GAF score. *See* 20 C.F.R. § 404.1527(d)(2)-(4). As substantially supported by the record, the ALJ reasoned that Dr. Howland's was inconsistent with "the medical record as a whole." (Tr. 21). For example, Dr. Patrick noted in May 2000 that Arruda had no limitations with her ability to carry out simple instructions and was only slightly limited in her ability to maintain concentration, complete tasks, make simple decisions at work and respond appropriately to co-workers and supervisors.[21] (Tr. 210). The mental RFCs from Dr. Chipman and Dr. Fischer (Tr. 141–143 & 251–253), both nonexamining, nontestifying physicians, also support the ALJ's assessment.[22] Furthermore, both these mental RFCs provide narrative assessments (Tr. 143 & 253) reflecting a significant level of attention and thought afforded by the physicians to their assessments. *See Mason v. Shalala,* 994 F.2d at 1065; *Berrios Lopez v. Secretary of Health and Human Services,* 951 F.2d at 431. While Dr. Slayton opined that Arruda "would have a difficult time with cowork-

ers and supervisors under routine work circumstances," he also surmised that "she would do a good job retraining in a structured work setting that took into account her personality traits and multiple medical problems." (Tr. 156). Finally, consistent with Dr. Slayton's and Dr. Howland's observations (Tr. 154 & 311), the ALJ noted the absence of hospitalization for Arruda's mental condition.

In light of the foregoing, substantial evidence supports the ALJ's assessment of Arruda's mental restrictions and Dr. Howland's opinion. The conflict between Dr. Howland and these other physicians was therefore for the Secretary to resolve. *See Tremblay v. Secretary of Health and Human Services,* 676 F.2d 11, 12 (1st Cir. 1982) ("conflict between the personal physician and the medical advisor was for the Secretary to resolve" and there was substantial evidence to support the Secretary's conclusion).

■ Citing *Avery v. Secretary of Health and Human Services,* 797 F.2d 19 (1st Cir.1986), Arruda next argues that the ALJ failed to follow the proper standards in evaluating Arruda's subjective complaints of pain.[23] The ALJ did not dis-

---

thereby showing a brief treatment relationship which, in turn, lessens the impact of the opinion. *See* 20 C.F.R. § 404.1527(d)(2)(i).

Arruda submits that the ALJ inaccurately concluded that Dr. Howland was an examining as opposed to a treating source and ignored the testimony that the second visit was not a referral from her attorney. The latter contention is correct because Dr. Howland's notes simply state that Arruda was *"originally* referred by her attorney." (Tr. 289; emphasis added). The error, however, does not warrant a remand and the ALJ correctly noted that the August 8th visit was a referral from Arruda's attorney. (Tr. 21, n. 3; Tr. 286, ¶ 1).

21. In contrast, Dr. Howland opined, albeit in December 2001, that Arruda's ability to respond to supervision and relate to other people is "moderately severe" and her ability to

respond to customary work pressure is "severe."

22. As previously noted, in finding Arruda capable of performing sedentary work, the ALJ incorporated moderate restrictions on Arruda's ability to maintain attention; deal appropriately with the public, coworkers and supervisors; "and deal appropriately with the ordinary requirements of attendance, perseverance and pace." (Tr. 23). He also placed a severe restriction on Arruda's ability to remember and carry out detailed instructions.

23. As separately noted by the court in *Avery,* the Social Security Act "makes clear that, as a primary requirement, there must be a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Avery v. Secretary of Health and Human Services,* 797 F.2d at 21; *see* 20 C.F.R. § 404.1529(b). The MRI provides the

count the entirety of Arruda's subjective complaints of pain. Instead, he found that she had "impairments that could reasonably be expected to produce the symptoms she alleges." (Tr. 20).

■ The ALJ nevertheless did not find Arruda fully credible to the extent she described impairments so severe as to preclude all sustained work activity.[24] Where, as here, the degree of alleged pain " 'is significantly greater than that which can be reasonably anticipated based on the objective physical findings,' " the ALJ should " 'obtain detailed descriptions of [the claimant's] daily activities' " and it is " 'essential to investigate all avenues presented that relate to subjective complaints.' " *Avery v. Secretary of Health and Human Services*, 797 F.2d at 23 (quoting instructions from the Secretary and finding that such instructions "conform faithfully to the Act"); *see also Dedis v. Chater*, 956 F.Supp. at 54; *Morgan v. Chater*, 1996 WL 392144 at * 13 (D.N.H. April 26, 1996). Similarly, Social Security Ruling 96–7p, relied upon by Arruda and issued after *Avery*, describes evidence relevant to evaluating pain as including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Farris v. Barnhart*, 2002 WL 449289 at * 3–4 (D.Me. March 25, 2002) (quoting Social Security Ruling 96–7p); *see also* 20 C.F.R. § 404.1529(c)(3).

The ALJ recited the aforementioned relevant factors to consider and applied them to Arruda's complaints and allegations of pain. At the hearing, he elicited the information that Arruda suffered a fall at work and fully explored her daily activities, including shopping, housework and preparing meals.[25] (Tr. 33, 36–39 & 41–42). He

necessary evidence of a "medically determinable impairment" that can reasonably be expected to produce the symptoms such as pain and, in conformity therewith, the ALJ found that Arruda had impairments that could reasonably be expected to produce the symptoms she alleges.

**24.** Dr. Stern's classification of Arruda's pain as "moderate" rather than "severe" supports the ALJ's assessment. (Tr. 268). Dr. Stern's January 2001 letter to Dr. Patrick similarly describes "[t]he pain [as] not consistently severe, but tending to wax and wane in severity." (Tr. 273).

**25.** To a degree, the ALJ understated Arruda's ability to perform daily activities. Arruda testified to performing these tasks with difficulty.

She stated that it "takes long" to make breakfast. (Tr. 37). She noted that where it takes a "regular person" five minutes to make a sandwich, it takes her an hour. (Tr. 38). She does the dishes and folds laundry sitting in a chair. (Tr. 39 & 124). Although she grocery shops, she cannot carry the bags. (Tr. 38–39).

The ALJ did not, however, misstate Arruda's activities. Moreover, evidence in the record supports the ALJ's findings. For example, Dr. Stern classified Arruda's symptoms as "moderate" rather than "severe." (Tr. 269). Dr. Howland stated that Arruda is "able to cook" although "she cannot lift heavier pots." (Tr. 287). According to Dr. Howland, Arruda was also able to make a shopping list, "pay for her groceries, but cannot carry bags" ex-

described her medications and the absence of side effects from Vicodin, which, he noted, Arruda takes to relieve the pain.[26] He also noted that she drives occasionally. As is evident from the ALJ's opinion, he fully recognized his obligations to evaluate Arruda's pain.[27] (Tr. 20, ¶ 2). He also fully discharged those obligations. (Tr. 20, ¶¶ 3 & 4); *see, e.g., Berrios Lopez v. Secretary of Health and Human Services,* 951 F.2d at 429 (ALJ adequately discussed and considered claimant's pain under *Avery* noting that she could walk without assistance and drive an automobile); *Gordils v. Secretary of Health and Human Services,* 921 F.2d at 330 (ALJ described claimant's daily activities as intact, her ability to walk and drive and her demeanor thereby complying with *Avery* ). The ALJ's credibility determination, which he supports with specific findings, "is entitled to deference." *Frustaglia v. Secretary of Health and Human Services,* 829 F.2d at 195; *see also Ortiz v. Secretary of Health and Human Services,* 890 F.2d 520, 523 (1st Cir.1989) ("'particular attention'' is afforded an ALJ's "evaluations of complaints of pain in light of their 'subjective nature'"). Given the record, Arruda's argument that the ALJ failed to adhere to the proper standards in evaluating her pain is unconvincing.

■ Arruda next asserts that the ALJ failed to consider her diabetes as an impairment. Although not discussed at great length in the opinion, the ALJ recognized that Arruda was being treated for diabetes mellitus and alleged a disability from that condition. (Tr. 18 & 19). He also found that the diabetes mellitus constituted a severe medically determinable impairment at step two.

Nevertheless, it is true that Dr. Patrick's notes are replete with references to Arruda's treatment for diabetes mellitus. On the other hand, there is little, if any, indication in the record that the condition affects Arruda's ability to engage in sedentary work. The thrust and focus of the residual functional capacity assessments is upon Arruda's pain, mental and back ailments. Dr. Patrick's and Dr. Stern's pain questionnaires identify only lumbar disc herniation or disease as opposed to diabetes mellitus as Arruda's impairment. (Tr. 268 & 324). Indeed, on her most recent questionnaire, Dr. Patrick, Arruda's treating physician, was asked whether Arruda suffers from an impairment that significantly limits her ability to perform basic work. Answering affirmatively, Dr. Patrick only identifies the diagnosis of "lumbar disk disease" at L–4 to L–5. (Tr. 325). In addition, Dr. Palmeri notes that Arruda has diabetes mellitus but classifies it as not a severe impairment. (Tr. 241). The ALJ did not ignore the evidence of Arruda's diabetes mellitus. Rather, he recognized

---

cept for "one or two very light items." (Tr. 287). Dr. Howland also noted that Arruda is able to dress and bathe herself. (Tr. 287).

26. Arruda testified at the hearing that when her medications are increased she feels "like a zombie." (Tr. 45). When she takes the medications, however, the pain is dulled to an ache. (Tr. 45).

27. In the opinion, the ALJ summarizes the relevant inquiry:

In evaluating subjective complaints, the undersigned must give careful consideration to the claimant's daily activities; the location, duration, frequency and intensity of the claimant's symptoms; the type, dosage, effectiveness, and adverse side-effects of any medications the claimant has taken to alleviate her symptoms; treatment, other than medication, the claimant has received; other measures used by the claimant to relieve her symptoms; other factors concerning the claimant's functional limitations and restrictions due to her symptoms. (Tr. 20, ¶ 2). The summary comports with the relevant analysis required under the regulations. *See* 20 C.F.R. § 404.1529(c)(3) & (4); *accord* Social Security Ruling 96–7p.

and considered the condition but, consistent with the record, focused upon the more disabling conditions. Substantial evidence supports the ALJ's limited consideration of this impairment.

■ As a final matter, Arruda submits that the ALJ failed to comply with regulations by making certain required findings with respect to Arruda's mental impairments. In particular, Arruda relies on 20 C.F.R. § 416.920a(c) and 416.920a(e) [28] and complains that the ALJ did not make specific findings or otherwise rate Arruda's activities in two of the four required categories in accordance with the regulations.

Because, as discussed *infra*, the regulations at issue involve step two, it is useful to review the ALJ's sequential decision process. In step two, the ALJ determined that Arruda suffered from a severe impairment and that the medical evidence indicated that Arruda has, in addition to her back pain, diabetes mellitus, obesity and the mental impairment of depression. In step three, he determined, *inter alia*, that Arruda's depression was not severe enough to meet the equivalent of a listed impairment in section 12.04 of Appendix 1 in Subpart P. (Tr. 18). Having therefore

determined that Arruda's depression was severe, albeit not the equivalent of a listed impairment, the ALJ then proceeded to determine, as required by the regulations, Arruda's physical and mental residual functional capacity. 20 C.F.R. § 416.920a(d)(3).[29]

As noted, the regulations that Arruda relies upon apply to the ALJ's determinations under step two, i.e., the existence of a severe impairment. When the severity of a mental impairment is determined at step two, "SSA regulations require the ALJ to utilize a 'special technique' at each [level] [30] of the administrative review process." *Pabon v. Barnhart,* 273 F.Supp.2d 506, 513 (S.D.N.Y.2003) (citing 20 C.F.R. § 416.920a(a)). Stated otherwise, the regulations, 20 C.F.R. §§ 404.1520a(c) and 416.920a(c), "provide[ ] the framework within which the ALJ should" determine whether the claimant has "a 'severe' mental impairment." *Torres v. Barnhart,* 249 F.Supp.2d 83, 95 (D.Mass.2003).

"At step two," 20 C.F.R. § 416.920a requires the ALJ to "rate the degree of functional limitation resulting from the claimant's mental impairment(s) to determine whether they are 'severe.'" *Rosado*

---

**28.** Although Arruda cites regulation "20 CFR 920a(c)(2)" and "20 CFR 920a(e)(2)" (Docket Entry # 13, p. 16), this court assumes that Arruda intended to cite 20 C.F.R. § 416.920a(c) and 416.920a(e), the applicable regulations for evaluating mental impairments.

This regulation, 20 C.F.R. § 416.920a, is identical "for all intents and purposes" to 20 C.F.R. § 404.1520a. *Torres v. Barnhart,* 249 F.Supp.2d 83, 94 n. 7 (D.Mass.2003). Although the discussion applies equally to both regulations, this court primarily cites to 20 C.F.R. § 416.920a, the regulation relied upon by Arruda.

**29.** Regulation 416.920a(d)(3) and its counterpart in Part 404, 20 C.F.R. § 404.1520a(d)(3), provide that:

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing,

we will then assess your residual functional capacity.

20 C.F.R. § 416.920a(d)(3); 20 C.F.R. § 404.1520a(d)(3).

**30.** Although the exact quote uses the word "step" as opposed to the word "level," the regulations clarify that the technique must be used at each level in the administrative review process as opposed to each step in the evaluation process. To avoid confusing the levels of administrative review with the five part sequential steps of evaluation, this court inserts the word "level" which is the word used in the regulation. *See* 20 C.F.R. § 416.920a(a) ("when we evaluate the severity of mental impairments for adults ..., we must follow a special technique at each level in the administrative review process").

*v. Barnhart,* 290 F.Supp.2d 431, 437 (S.D.N.Y.2003); *Pabon v. Barnhart,* 273 F.Supp.2d at 513 ("[a]t step two . . ., the ALJ must rate the degree of functional limitation resulting from the claimant's mental impairment(s) to determine whether or not they are 'severe' "); 20 C.F.R. §§ 416.920a(b)(2), 416.920a(c) & 416.920a(e)(2); *see Ashby v. Barnhart,* 2003 WL 22245142 at * 2 (E.D.Pa. June 11, 2003) (ALJ must "rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work;" citing 20 C.F.R. §§ 404.1520a(b)(2) & 416.920a(b)(2)).[31] The regulations specify four broad areas to conduct the rating using a five point scale. *Pabon v. Barnhart,* 273 F.Supp.2d at 513; *Torres v. Barnhart,* 249 F.Supp.2d at 96 ("§ 404.1520a(c)(3) delineates the 'four broad functional areas in which [the ALJ] will rate the degree of [her] functional limitation' "); *Rosado v. Barnhart,* 2003 WL 22703935 at * 5 (S.D.N.Y. Nov.13, 2003). These four functional areas, as correctly noted in Arruda's brief (Docket Entry # 13, p. 16), are "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Pabon v. Barnhart,* 273 F.Supp.2d at 513.[32]

Further, in no uncertain terms, 20 C.F.R. § 416.920a(e)(2) states that the ALJ's "decision must include a specific finding as to the degree of limitation in each of the [four] functional areas." Arruda argues that the ALJ only rated her with respect to her physical impairments as opposed to her mental impairments and even then did not rate her in the categories of social functioning and episodes of decompensation.

To the contrary, however, the ALJ's decision states that, "The claimant is further affected by moderate limitations in her ability to: maintain attention and concentration; deal appropriately with the public, coworkers, and supervisors; and deal with the ordinary requirements of attendance, perseverance and pace." (Tr. 21). Although discussed in connection with Arruda's residual functional capacity, the findings provide the necessary ratings for the functional areas of social activities, *see* 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(2) (defining "social activities" as including ability to get along with others and, in work situations, "responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers") and concentration, persistence or pace. *See, e.g., Molina v. Massanari,* 2001 WL 1502587 at * 7 (D.Me. Nov.26, 2001) (while the ALJ's techniques did not precisely track the regulations, the differences were not significant and were "sufficiently similar to that required by the current regulation to make remand unnecessary").

As to the daily living rating, Arruda admits that the ALJ states that "The evidence indicates that the claimant's activities of daily living are not significantly impaired, as she is capable of maintaining a household and providing for her personal needs."[33] (Tr. 20). Arruda's argument

---

**31.** The June 11, 2003 *Ashby* opinion is a report and recommendation recommending a remand to the ALJ. One month later, the district court adopted the recommendation in part. In lieu of remanding the matter to the ALJ for further findings, the district court remanded the matter for an immediate award of benefits. *Ashby v. Barnhart,* 2003 WL 22272151 (E.D.Pa. July 28, 2003).

**32.** The first three categories "use the following five point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. § 416.920a(c)(4). The final category uses "the following four point scale: None, one or two, three, four or more." 20 C.F.R. § 416.920a(c)(4).

**33.** Arruda's brief only quotes the first portion of this sentence.

with respect to the daily living category confines itself to the allegation that the ALJ's rating "was only from the point of view of her physical activities." (Docket Entry # 13, p. 16). The argument, however, ignores that the next sentence in the opinion after the above quote discusses the opinions of Dr. Howland regarding Arruda's mental limitations.

Substantial evidence supports the ALJ's ratings and findings. The above ratings vis-à-vis Arruda's daily activities, social functioning and concentration, persistence or pace comport with the PRTFs in the record. (Tr. 149 & 263). Dr. Chipman and Dr. Fischer rated Arruda's daily activities as "mild", social functioning as "moderate," concentration, persistence or pace as also "moderate" and found "insufficient evidence" with respect to the category of episodes of decompensation. (Tr. 149; *see also* Tr. 141–142).

In addition to these ratings, Dr. Slayton noted that Arruda has problems dressing and is slow to the dishes. Dr. Howland noted Arruda's well groomed appearance (Tr. 311) which also supports Dr. Chipman's rating regarding Arruda's daily activities. *See* 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(1) (defining "activities of daily living" as including "grooming and hygiene"). Dr. Howland further noted that Arruda "has a group of friends with whom she speaks" and attends church in good weather thereby lending credence to Dr. Chipman's rating regarding social functioning.[34] Dr. Slayton opines that, "It is conceivable that [Arruda] would do a good job retraining in a structured work setting that took into account her personality traits and multiple medical problems and that she would be motivated to pursue this given her identity until the past year has been as a working person." (Tr. 155–156).

Such findings provide substantial evidence for the ALJ's ratings and conclusions regarding Arruda's mental limitations with respect to daily living, social functioning and concentration, persistence or pace. The fact that the ALJ made no findings regarding episodes of decompensation comports with the finding of Dr. Chipman and Dr. Fischer of "insufficient evidence" with respect to this functional limitation. As similarly reasoned by the court in *Torres* in affirming the ALJ's denial of benefits at step two, "The ALJ made no findings on episodes of decompensation because no evidence was offered that there had been any such episodes, and, consequently, the ALJ made no rating on this functional area." *Torres v. Barnhart*, 249 F.Supp.2d at 97. In any event, Dr. Slayton characterizes Arruda's speech as having a normal rhythm, rate and volume and further notes that Arruda is alert and oriented and is capable of repeating serial even numbers without a mistake.

 In the alternative, any nonconformity with the regulation, 20 C.F.R. § 416.920a(e)(2), does not warrant a remand. The error at issue implicates the remedy provided under the fourth as opposed to the sixth sentence of 42 U.S.C. § 405(g). *See Seavey v. Barnhart*, 276 F.3d 1, 13 (1st Cir.2001) ("[s]entence six and its 'good cause' limitation come into play only 'when the district court learns of evidence not in existence or available to the applicant at the time of the administrative proceeding that might have changed the outcome of that proceeding'"). The fourth sentence of 42 U.S.C. § 405(g) allows the court to "order the agency to provide the relief it denied," i.e., an award of benefits, "only in the unusual case in which the underlying facts and law are

---

**34.** Dr. Howland later characterized Arruda's daily activities as "very limited" and opined that, "[s]ocially, she is becoming increasingly isolated." (Tr. 310).

such that the agency has no discretion to act in any manner other than to award or to deny benefits." *Seavey v. Barnhart,* 276 F.3d at 11. Stated otherwise, "a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence." *Seavey v. Barnhart,* 276 F.3d at 11. The circumstances of this case and the error at issue, the failure of the ALJ to rate Arruda's episodes of decompensation, fall measurably below this standard.

The decision of "what remedy to apply under sentence four of § 405(g) is largely dictated by the type of error committed by the ALJ." *Seavey v. Barnhart,* 276 F.3d at 9. Furthermore, "[t]he question of remedy is tied to the strictures of § 405(g)" that " 'the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.' " *Seavey v. Barnhart,* 276 F.3d at 10.

The ALJ's error in not including a rating for episodes of decompensation in the decision as required under 20 C.F.R. § 416.920a(e)(2) does not merit a remand because a correction would not change, alter or impact the result. The error involved the ALJ's reasoning at step two. The ALJ already ruled in Arruda's favor at this level in the sequential process. He found that Arruda suffered from a severe mental impairment in the nature of depression. A remand would only confirm the ruling in Arruda's favor at step two.

 It is true that "if an *essential* factual issue has not been resolved . . . and there is no clear entitlement to benefits, the court must remand for further proceedings." *Seavey v. Barnhart,* 276 F.3d at 11 (emphasis added). Inclusion of the rating for episodes of decompensation in the decision is not an "essential factual issue," however, particularly where there is insufficient evidence in the record regarding this functional limitation. In addi-

tion, the regulation violated involves the evaluation made at step two of the presence of a "severe" impairment. The ALJ ruled in Arruda's favor with respect to this issue by finding that Arruda had an impairment or combination of impairments that was "severe." *See, e.g., Torres v. Barnhart,* 249 F.Supp.2d at 94 & 96–97 (upholding ALJ's denial of benefits notwithstanding ALJ's failure to make findings on claimant's episodes of decompensation rate as mandated by 20 C.F.R. § 404.1520a(c)(2) in the face of claimant's request for reversal or remand).

### CONCLUSION

In accordance with the foregoing discussion, Arruda's motion for summary judgment (Docket Entry # 12) is **DENIED** and the Commissioner's motion to affirm (Docket Entry # 15) is **ALLOWED.** A final judgment shall issue in accord with this opinion.